**BISNAR | CHASE LLP**
BRIAN D. CHASE (164109)
bchase@bisnarchase.com
JERUSALEM F. BELIGAN (211258)
jbeligan@bisnarchase.com
1301 Dove Street, Suite 120
Newport Beach, CA 92626
Telephone: 949/752-2999
Facsimile: 949/752-2777

**WOLF HALDENSTEIN ADLER
   FREEMAN & HERZ LLP**
JANINE L. POLLACK
pollack@whafh.com
DEMET BASAR
basar@whafh.com
KATE M. MCGUIRE
mcguire@whafh.com
270 Madison Avenue
New York, New York 10016
Telephone: 212/545-4600
Facsimile: 212/545-4653

**LEXINGTON LAW GROUP**
MARK N. TODZO (168389)
mtodzo@lexlawgroup.com
LUCAS WILLIAMS (264518)
lwilliams@lexlawgroup.com
503 Divisadero Street
San Francisco, CA 94117
Telephone: 415/913-7800
Facsimile: 415/759-4112

Attorneys for Plaintiffs
[Additional Counsel Listed on Following Page]

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION – SANTA ANA

| | |
|---|---|
| IN RE FONTEM US, INC. CONSUMER CLASS ACTION LITIGATION | Case No.: 8:15-cv-01026-JVS-RAO |
| | **Class Action** |
| | **SECOND CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF: (1) CAL. CONSUMERS LEGAL REMEDIES ACT; (2) CAL. UNFAIR COMPETITION LAW; (3) CAL. DECEPTIVE, FALSE AND MISLEADING ADVERTISING; (4) N.Y. GEN. BUS. LAW; (5) FRAUDULENT CONCEALMENT UNDER ILLINOIS LAW; AND (6) IL. CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT** |
| | **DEMAND FOR JURY TRIAL** |

**LEVI & KORSINSKY LLP**
EDUARD KORSINSKY
ek@zlk.com
SHANNON L. HOPKINS
shopkins@zlk.com
NANCY A. KULESA
nkulesa@zlk.com
STEPHANIE A. BARTONE
sbartone@zlk.com
30 Broad Street, 24th Floor
New York, NY 10004
Telephone: 212/363-7500
Facsimile: 866/367-6510

**SCOTT+SCOTT LLP**
CHRISTOPHER M. BURKE (214799)
cburke@scott-scott.com
JOHN T. JASNOCH, (281605)
jjasnoch@scott-scott.com
707 Broadway, Suite 1000
San Diego, CA 92101
Tel: 619/233-4565
Fax: 619/233-0508

**COHELAN KHOURY & SINGER**
TIMOTHY D. COHELAN (60827)
tcohelan@ckslaw.com
ISAM C. KHOURY (58759)
ikhoury@ckslaw.com
MICHAEL D. SINGER (179630)
msinger@ckslaw.com
JEFF GERACI (151519)
jconnor@ckslaw.com
605 "C" Street, Suite 200
San Diego, CA 92101
Telephone: 619/595-3001
Facsimile: 619/595-3000

**LAW OFFICES OF MICHAEL P. SOUSA, APC**
MICHAEL P. SOUSA (229416)
msousa@msousalaw.com
3232 Governor Drive, Suite A
San Diego, CA 92122
Telephone: 858/453-6122
Facsimile: 858/453-2155

**JOSE GARAY, APLC**
JOSE GARAY (200494)
jgaray@garaylaw.com
9861 Irvine Center Drive
Irvine, CA 92618
Telephone: 949/208-3400
Facsimile: 949/713-0432

**THE WILNER FIRM**
RICHARD J. LANTINBERG
rlantinberg@wilnerfirm.com
444 East Duval Street
Jacksonville, FL 32202
Telephone: 904/446-9817
Facsimile: 904/446-9825

**FORCHELLI   CURTO   DEEGAN SCHWARTZ   MINEO & TERRANA, LLP**
ELBERT NASIS
enasis@forchellilaw.com
The Omni
333 Earle Ovington Boulevard, Suite 1010
Uniondale, NY 11553
Telephone: 516/248-1700
Facsimile:516/248-1729

- 1 -

SECOND CONSOLIDATED AMENDED COMPLAINT

Plaintiffs Larry Diek, Frank Perez and Michael Whitney (the "California Plaintiffs"), Paul Pisciotto (the "New York Plaintiff"), and Tanya Mullins (the "Illinois Plaintiff") (collectively referred to herein as "Plaintiffs"), by and through their undersigned attorneys, file this Second Consolidated Amended Complaint ("SCAC"), joining two actions, one originally filed in Orange County Superior Court (the "*Diek* Action"), and one filed in the Northern District of California (the "*Whitney* Action"). Together Plaintiffs bring this action on behalf of themselves and all others similarly situated, based upon personal knowledge as to themselves and their activities, and on information and belief as to all other matters, against Defendants LOEC, Inc., Lorillard, Inc., Reynolds American, Inc. ITG Brands, LLC, Fontem US, Inc., and Fontem Holdings 4 B.V. (collectively "Defendants"),[1] and allege as follows:

## I.    NATURE OF THE ACTION

1.    Defendants, the manufacturers, sellers, and distributors of the BLU brand of electronic cigarettes (collectively, "BLU E-Cigarettes" or "BLUs"), have a uniform and long-standing pattern of employing unfair and deceptive practices with respect to the sale of their products through material omissions and partial misrepresentations concerning the potential health risks thereof.

---

[1] LOEC, Inc. was previously responsible for the development, manufacture, marketing and sale of Blu electronic cigarettes. In or about April 2012, Lorillard, Inc. acquired LOEC, Inc. In or about June 2015, Reynolds American, Inc. completed its acquisition of Lorillard, Inc. and in the related divestiture transactions, Blu was sold to ITG Brands, LLC (a subsidiary of Imperial Tobacco Group, PLC). LOEC, Inc. is still in existence, however, its assets and operations were transferred to Fontem US, Inc. Lorillard, Inc. is also still in existence, however, its assets and operations were transferred to Fontem Holdings 4 B.V.

2.     Throughout the class period,[2] Defendants actively concealed and failed to disclose to consumers that the aerosol produced by BLU E-Cigarettes contains dangerous carcinogens including, but not limited to, formaldehyde and also actively concealed and failed to disclose serious and dangerous respiratory issues that may be caused by smoking BLU E-Cigarettes.   In fact, packages in which BLU E-Cigarettes have been sold during the Class Period omitted information about certain material health risks associated with the use of BLU E-Cigarettes and their ingredients, despite stating other potential dangers of the products regarding nicotine

3.     Defendants' material omissions and partial misrepresentations on their packages are deceptive, false and misleading.

4.     Studies have shown that electronic cigarettes, including BLU E-Cigarettes, contain disease-causing substances that are dangerous to human health. As early as 2009, the United States Food and Drug Administration ("FDA") concluded that two leading brands of e-cigarettes contained detectable levels of known carcinogens and toxic chemicals including tobacco-specific nitrosamines. More recently, as expressly determined by the California Department of Public Health, the vapor in e-cigarettes like BLU E-Cigarettes is an aerosol that contains carcinogens and toxins that pose harm to the user and to people exposed to these carcinogenic materials second-hand:

---

[2] As set forth in ¶¶ 112, 128, and 146, the class period for the California Class is from April 22, 2011 until the date of notice.  As set forth in ¶ 180, the class period for the New York Class is October 2, 2012 until the date of notice.  As set forth in ¶¶ 192 and 202, the class period for the Illinois Class based on the fraudulent concealment claim is October 2, 2010 until the date of notice, and the class period for the Illinois Class based on the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq*. ("ICFA") is October 2, 2012 until the date of notice.  Unless stated otherwise, the four class periods are collectively referenced as the "Class Period."

SECOND CONSOLIDATED AMENDED COMPLAINT

5.     Studies also show that certain electronic cigarettes, including BLU E-Cigarettes, require users to take deeper puffs to produce vapor than the puffs required for a traditional tobacco cigarette, and that this could be harmful to the users' health.

6.     Furthermore, there is widespread agreement in the scientific community that further research is necessary before the full negative effects of electronic cigarette use on users' health can be known and that until then, manufacturers, sellers, and distributors of electronic cigarettes should not make any representation relating to the safety, health, or benefits, if any, of e-cigarettes. Therefore, Defendants' failure to disclose all of the known dangerous carcinogens and toxins emitted by BLU E-Cigarettes, and harmful health effects of taking deeper puffs to produce vapor is deceptive, false and misleading.

7.     Defendants' warning label is misleading and deceptive because while it identifies nicotine as a chemical component, it does not provide a full list of other carcinogenic ingredients and other disease-causing substances, including thoe noted by the California Department of Public Health, or the risks other than nicotine of inhaling BLU E-Cigarettes as shown by studies described herein below.  For example, when heated, the aerosol produced by BLU E-Cigarettes and inhaled by BLU users contains formaldehyde, a chemical known to the State of California and other entities to cause cancer.  Nevertheless, and despite California's statutory requirement that sellers of consumer products causing exposure to known carcinogens provide clear and reasonable warnings regarding such hazards, Defendants utterly fail to warn consumers and users of BLU E-Cigarettes that use of such products will expose them to a chemical known to cause cancer.  Defendants' listing of the ingredients on the package but failure to disclose to users the hidden ingredients of carcinogens and toxins caused by the heating of certain such ingredients was also a material omission and false partial misrepresentation.  This

failure to disclose was an intentional act designed to hide the potential dangers of the use of BLU E-Cigarettes from consumers.

8.    Defendants actively concealed and failed to disclose what they knew about the contents of their own products, including that BLU E-Cigarettes contain carcinogens, toxins, and other impurities (including some of those also found in tobacco cigarettes) in order to deceive the consuming public to buy their product. Defendants knew that had they been truthful and fully informed the consuming public that their products emitted known carcinogens, such as formaldehyde, consumers would not have purchased their products or would have paid less than the retail price.

9.    As a result of Defendants' material omissions and partial misrepresentations on their packages, consumers – including Plaintiffs and the other members of the proposed Classes – purchased BLU E-Cigarettes without being advised that they contain a variety of toxins, impurities, and related potential health hazards as found by various studies, and do not have the particular standard or quality as represented in their packaging.  Had Defendants disclosed these material facts, Plaintiffs would not have purchase, or would have paid less for, Defendants' BLU E-Cigarettes.  Defendants were able to charge more than what their BLU E-Cigarettes would have been worth had they disclosed the truth about them.

10.    Plaintiffs bring this lawsuit against Defendants, on behalf of themselves and the proposed Classes, in order to: (a) require Defendants to disclose the risks associated with inhaling BLU E-Cigarettes as discussed herein below, in order to ensure that consumers are fully informed when they make their purchasing decision; and (b) secure redress for consumers who purchased one or more BLU E-Cigarettes through Defendants' material omissions and partial misrepresentations.  Plaintiffs, on behalf of themselves and the proposed Classes, allege violations of the California Consumers Legal Remedies Act, Civil Code § 1750, *et seq.* ("CLRA"), California's Unfair Competition Law, Business & Professions Code § 17200, *et seq.* ("UCL"),

California's False Advertising Law, Business & Professions Code § 17500, *et seq.* ("FAL"), New York General Business Law § 349 ("GBL"), and fraudulent concealment under Illinois law, and ICFA.

## II.    JURISDICTION AND VENUE

11.    This is a consolidated action against Defendants for violations of: (1) California's CLRA, Civil Code § 1750, *et seq.*; (2) California's UCL, Business & Professions Code § 17200, *et seq.*; (3) California's FAL, Business & Professions Code § 17500, *et seq.*; (4) New York GBL § 349; (5) fraudulent concealment under Illinois law; and (6) Illinois ICFA, 815 ILCS 505/1.

12.    On June 26, 2015, Defendants removed the *Diek* Action to federal court which was eventually assigned to this Court.  Dkt. No. 1 (Notice of Removal of Action (the "Notice")).  According to the Notice, the *Diek* Action is within the original jurisdiction of this Court under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), which grants district courts original jurisdiction over class actions in which the amount in controversy exceeds $5,000,000 and any member of the class of plaintiffs is a citizen of a State different from any defendant. *Id*. at ¶ 12.  The Notice states that the *Diek* Action satisfies each of the requirements of Section 1332(d)(2) for original jurisdiction under CAFA for the following reasons: (1) the *Diek* action purportedly meets the CAFA definition of a class action, which is "any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar statute or rule of judicial procedure"; (2) the aggregate number of class members is greater than 100 persons; (3) there is diversity between Plaintiffs and Defendants; and (4) Defendants have sold in excess of $5,000,000 of e-cigarettes within California alone during the last four years.  *Id*. at ¶¶ 13-16.  Accordingly, this Court has jurisdiction of the *Diek* Action pursuant to 28 U.S.C. § 1332(d) based on the Notice.

///

///

13.     On September 1, 2015, Plaintiff Whitney filed a complaint in the Northern District of California.  On that same date, Plaintiff Whitney served a 60-day notice of intent to sue under California's Proposition 65, Cal. Health and Safety Code §§ 25249.5, *et seq*.  Following expiration of the notice period, Plaintiff Whitney filed a First Amended Complaint on November 13, 2015.  Given the potential overlap between issues in the *Whitney* and *Diek* Actions, Plaintiff Whitney agreed to transfer his complaint to the Central District of California in order to consolidate his case with the *Diek* Action.  The *Whitney* Action was transferred on November 25, 2015 and the request to consolidate the *Whitney* and *Diek* Actions was granted on December 8, 2015.

14.     This Court has personal jurisdiction over Defendants because Defendants have purposefully availed themselves of the privilege of conducting business in the State of California by advertising and selling their brand of electronic cigarettes to retailers and consumers in California.  Defendants and their agents have prepared, disseminated, or made available print advertisements, Internet advertisements and related materials through their website,[3] all of which are at issue here, in California.

15.     Jurisdiction over the New York and Illinois Plaintiffs is proper pursuant to 28 U.S.C. § 1367, which provides, in relevant part, that: (a) "in any action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution … includ[ing] claims that involve the joinder … of additional parties."

---

[3] BLU's website is located and can be viewed at http://blucigs.com/.

SECOND CONSOLIDATED AMENDED COMPLAINT

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because many of the acts and transactions giving rise to this action occurred in this District and because Defendants:

a.     Have intentionally availed themselves of the laws and markets within this District through the promotion, marketing, distribution and sale of their products in this District;

b.     do substantial business in this District; and

c.     are subject to personal jurisdiction in this District;

and because some of the California Plaintiffs:

a.     were exposed to Defendants' material omissions and fraudulent partial misrepresentations in this District; and

b.     purchased BLU E-Cigarettes in this District.

## III.   PARTIES

### A.     Plaintiffs

#### Plaintiff Diek

17.     Plaintiff Diek is an individual who resides in Orange County, California and is a citizen of California.  During the relevant period, Plaintiff Diek, while in the State of California, was fraudulently misled and deceived by Defendants in two ways: first, Defendants actively concealed material facts from Plaintiff Diek, depriving him of an opportunity to make a fully informed decision on whether to purchase BLU E-Cigarettes; and second, Defendants made fraudulent partial misrepresentations on the packaging in which they sold BLU E-Cigarettes to Plaintiffs and members of the Classes.     As a result of Defendants' active concealment of material facts and fraudulent partial misrepresentations contained on the packaging, Plaintiff Diek purchased BLU E-Cigarettes while in the State of California.   Had Defendants disclosed that BLUs contain a variety of toxins, impurities, carcinogens (such as formaldehyde) and other potential health hazards which were or should have been known to Defendants as confirmed by various studies discussed in more detail below, including studies performed on Defendants'

- 8 -

BLU E-Cigarettes, Plaintiff Diek would not have purchased, or would have paid less for, Defendants' BLUs.

18.     In addition, Plaintiff Diek saw Defendants' fraudulent partial misrepresentations contained on the BLU packages before he purchased them in California.   Plaintiff Diek, relying on the warning on the packages and the ingredient list, purchased BLU E-Cigarettes believing that the only material health risks associated with using them were those that were disclosed on the package relating to nicotine.  Plaintiff Diek would not have purchased, or would have paid less for, BLU E-Cigarettes had he known that studies have found, including studies performed on BLU E-Cigarettes, that they contain detectable levels of known carcinogens, toxic chemicals and other contaminants and impurities that are, or potentially are, disease-causing.  Plaintiff Diek would not have purchased, or would have paid less for, BLU E-Cigarettes had he known that they may have potentially harmful respiratory and other side effects other than those related to nicotine, and that the full range and long-term health effects of BLUs are not yet known, as confirmed in the studies referenced in this SCAC.  Thus, as a result of Defendants' active concealment and omission of material facts and fraudulent partial misrepresentations, Plaintiff Diek suffered injury in fact and lost money when he purchased Defendants' BLU E-Cigarettes.  Prior to the filing of this SCAC, from approximately mid to late 2014, Plaintiff Diek regularly purchased BLU E-Cigarettes from gas stations in Orange County and A-1 Smoke & Cigar Shop, located at 22359 El Toro Road, Lake Forest, California 92630.  Plaintiff Diek paid the retail market price for BLUs, which ranged between $10 and $12.

**Plaintiff Perez**

19.     Plaintiff Perez is an individual who resides in Merced, California and is a citizen and resident of the State of California.  During the relevant period, Plaintiff Perez, while in the State of California, was fraudulently misled and deceived by Defendants in two ways: first, Defendants actively concealed material facts from Plaintiff Perez, depriving him of an opportunity to make a fully informed decision

1    on whether to purchase BLU E-Cigarettes; and second, Defendants made fraudulent
2    partial misrepresentations on the packaging in which they sold BLU E-Cigarettes to
3    Plaintiffs and members of the Classes.   As a result of Defendants' active
4    concealment of material facts and fraudulent partial misrepresentations contained on
5    the packaging, Plaintiff Perez purchased BLU E-Cigarettes while in the State of
6    California.   Had Defendants disclosed that BLUs contain a variety of toxins,
7    impurities, carcinogens (such as formaldehyde) and other potential health hazards
8    which were or should have been known to Defendants as confirmed by various
9    studies discussed in more detail below, including studies performed on Defendants'
10   BLU E-Cigarettes, Plaintiff Perez would not have purchased, or would have paid
11   less for, Defendants' BLUs.

12       20.   In addition, Plaintiff Perez saw Defendants' fraudulent partial
13   misrepresentations contained on the BLU packages before he purchased them in
14   California.   Plaintiff Perez, relying on the warning on the packages and the
15   ingredient list, purchased BLU E-Cigarettes believing that the only material health
16   risks associated with using them were those that were disclosed on the package
17   relating to nicotine.   Plaintiff Perez would not have purchased, or would have paid
18   less for, BLU E-Cigarettes had he known that studies have found, including studies
19   performed on BLU E-Cigarettes, that they contain detectable levels of known
20   carcinogens, toxic chemicals and other contaminants and impurities that are, or
21   potentially are, disease-causing.   Plaintiff Perez would not have purchased, or would
22   have paid less for, BLU E-Cigarettes had he known that they may have potentially
23   harmful respiratory and other side effects other than those related to nicotine, and
24   that the full range and long-term health effects of BLUs are not yet known, as
25   confirmed in the studies referenced in this SCAC.   Thus, as a result of Defendants'
26   active concealment and omission of material facts     and fraudulent partial
27   misrepresentations, Plaintiff Perez suffered injury in fact and lost money when he
28   purchased Defendants' BLU E-Cigarettes.   Prior to the filing of this SCAC, in

- 10 -

SECOND CONSOLIDATED AMENDED COMPLAINT

approximately November 2012, Plaintiff Perez purchased BLU E-Cigarettes from Walmart located at 3055 Loughborough Drive, Merced, California 95348.  Plaintiff Perez purchased a kit and cartridges, and paid the retail market price for BLUs.

### Plaintiff Whitney

21.    Plaintiff Whitney is an individual consumer who, at all times material hereto, was a citizen of San Diego County, California.  During the relevant period, Plaintiff Whitney, while in the State of California, was fraudulently misled and deceived by Defendants in two ways: first, Defendants actively concealed material facts from Plaintiff Whitney, depriving him of an opportunity to make a fully informed decision on whether to purchase BLU E-Cigarettes; and second, Defendants made fraudulent partial misrepresentations on the packaging in which they sold BLU E-Cigarettes to Plaintiffs and members of the Classes.   As a result of Defendants' active concealment and omission of material facts and fraudulent partial misrepresentations contained on the packaging, Plaintiff Whitney purchased BLU E-Cigarettes at various locations in Oceanside, California and San Diego County throughout the Class Period, as defined below.  More specifically, in early 2015, Whitney purchased the Blu Starter Pack in the cherry flavor numerous times at Mike's Liquor in Oceanside, California.  The packaging for the BLU E-Cigarettes he purchased did not disclose that the user would be or could be exposed to formaldehyde, other chemicals known to the State of California and other entities to cause cancer, or other potential toxins, carcinogens, impurities or health hazards.

22.    Plaintiff Whitney relied on Defendants' deceptive material omissions and fraudulent partial misrepresentations concerning the nature of the BLU E-Cigarettes.  Plaintiff Whitney would not have purchased, or would have paid less for, the BLU E-Cigarettes had he known the material facts omitted by Defendants: that BLU E-Cigarettes will expose users to the carcinogenic toxin formaldehyde.  If Defendants were to manufacture BLUs in a manner that BLU E-Cigarettes did not expose users to harmful chemicals such that Plaintiff Whitney knew that labels on

- 11 -

1    Defendants' BLU E-Cigarettes were truthful and not misleading, he would consider

2    purchasing the BLU E-Cigarettes in the future.  At present, however, Plaintiff

3    Whitney cannot be confident that the labeling of the BLU E-Cigarettes is, and will

4    be, truthful and non-misleading.  Plaintiff Whitney is very concerned regarding the

5    adverse health effects of using the BLU E-Cigarettes and is thus interested in

6    learning all of the facts known to Defendants regarding the toxic exposures resulting

7    from their use.

8                                    **Plaintiff Pisciotto**

9          23.    Plaintiff Pisciotto is an individual who resides in Suffolk County, New

10   York and is a resident and citizen of the State of New York.  During the relevant

11   period, Plaintiff Pisciotto, while in the State of New York, was fraudulently misled

12   and deceived by Defendants in two ways: first, Defendants actively concealed

13   material facts from Plaintiff Pisciotto, depriving him of an opportunity to make a

14   fully informed decision on whether to purchase BLU E-Cigarettes; and second,

15   Defendants made fraudulent partial misrepresentations on the packaging in which

16   they sold BLU E-Cigarettes to Plaintiffs and members of the Classes.  As a result of

17   Defendants' active concealment and omission of material facts and fraudulent

18   partial misrepresentations contained in the packaging, Plaintiff Pisciotto purchased

19   BLU E-Cigarettes while in the State of New York.  Had Defendants disclosed that

20   BLUs contain a variety of toxins, impurities, carcinogens (such as formaldehyde)

21   and other potential health hazards which were or should have been known to

22   Defendants as confirmed by various studies discussed in more detail below,

23   including studies performed on Defendants' BLU E-Cigarettes, Plaintiff Pisciotto

24   would not have purchased, or would have paid less for, Defendants' BLUs.

25         24.    In addition, Plaintiff Pisciotto saw Defendants' fraudulent partial

26   misrepresentations contained on the BLU packages before he purchased them in

27   New York.  Plaintiff Pisciotto, relying on the warning on the packages and the

28   ingredient list, purchased BLU E-Cigarettes believing that the only material health

risks associated with using them were those that were disclosed on the package relating to nicotine.  Plaintiff Pisciotto would not have purchased, or would have paid less for, BLU E-Cigarettes had he known that studies have found, including studies performed on BLU E-Cigarettes, that they contain detectable levels of known carcinogens, toxic chemicals and other contaminants and impurities that are, or potentially are, disease-causing.  Plaintiff Pisciotto would not have purchased, or would have paid less for, BLU E-Cigarettes had he known that they may have potentially harmful respiratory and other side effects other than those related to nicotine, and that the full range and long-term health effects of BLUs are not yet known, as confirmed in the studies referenced in this SCAC.  Thus, as a result of Defendants' active concealment and omission of material facts and fraudulent partial misrepresentations, Plaintiff Pisciotto suffered injury in fact and lost money when he purchased Defendants' BLU E-Cigarettes.  Prior to the filing of this SCAC, Plaintiff Pisciotto purchased BLU E-Cigarettes from a 7-11 store, located at 1733 Old Country Road in Riverhead, New York, 11901.  Plaintiff Pisciotto first purchased a disposable BLU E-Cigarette between approximately mid-July and mid-August of 2013, and believes he purchased approximately one dozen additional disposable BLU E-Cigarettes thereafter.  Plaintiff Pisciotto purchased BLUs in the tobacco flavor, and paid the retail market price for BLUs, which he believes to be approximately $10.

### Plaintiff Mullins

25.    Plaintiff Mullins is an individual who resides in Cook County, Illinois and is a resident and citizen of Illinois.  During the relevant period, Plaintiff Mullins, while in the State of Illinois, was misled and deceived by Defendants' active concealment of material facts, which if disclosed, would have influenced her decision to buy Defendants' BLU E-Cigarettes.  As a result of Defendants' intentional and active concealment of material facts, Plaintiff Mullins purchased BLU E-Cigarettes while in the State of Illinois.  Had Defendants disclosed that

- 13 -

BLUs contain a variety of toxins, impurities, carcinogens (such as formaldehyde) and other potential health hazards which were or should have been known to Defendants as confirmed by various studies discussed in more detail below, including studies performed on Defendants' BLU E-Cigarettes, Plaintiff Mullins would not have purchased, or would have paid less for, Defendants' BLUs.

26. In addition, Plaintiff Mullins saw Defendants' fraudulent partial misrepresentations contained on the BLU packages before she purchased them in Illinois. Plaintiff Mullins, relying on the warning on the packages and the ingredient list, purchased BLU E-Cigarettes believing that the only material health risks associated with using them were those that were disclosed on the package relating to nicotine. Plaintiff Mullins would not have purchased, or would have paid less for, BLU E-Cigarettes had she known that studies have found, including studies performed on BLU E-Cigarettes, that they contain detectable levels of known carcinogens, toxic chemicals and other contaminants and impurities that are, or potentially are, disease-causing. Plaintiff Mullins would not have purchased, or would have paid less for, BLU E-Cigarettes had she known that they may have potentially harmful respiratory and other side effects other than those related to nicotine, and that the full range and long-term health effects of BLUs are not yet known, as confirmed in the studies referenced in this SCAC. Thus, as a result of Defendants' intentional and active concealment of these material facts and fraudulent partial misrepresentations, Plaintiff Mullins suffered injury in fact and lost money when she purchased Defendants' BLU E-Cigarettes. Prior to the filing of this SCAC, from approximately March 2013 through approximately August 2013, Plaintiff Mullins regularly purchased BLU E-Cigarettes from convenience stores and gas stations in and around the Chicago area, including the Mobil gas station in River Grove, IL. She purchased multiple rechargeable kits with USB ports, and refills for the kits, as well as several single pack disposables. Plaintiff Mullins paid the retail market price for BLUs. On information and belief, she paid

- 14 -

1  approximately $14.99 for the kits, under $14.99 for the refills, and approximately

2  $9.99 for the disposables.

3  **B.**  **Defendants**

4  27.  LOEC, Inc. is a corporation with its corporate headquarters located at

5  9101 Southern Pine Boulevard, Charlotte, NC 28273.

6  28.  Lorillard, Inc. is a corporation with its corporate headquarters located at

7  300 North Greene Street, Suite 1601, Greensboro, NC 27401.

8  29.  Reynolds American, Inc. is a corporation with its corporate

9  headquarters located at 401 North Main Street, Winston-Salem, NC 27101-3804

10  30.  ITG Brands, LLC is a limited liability company with its corporate

11  headquarters located at 5900 North Andrews Avenue, Suite 1100, Fort Lauderdale,

12  FL 33309.

13  31.  Fontem US, Inc. is a corporation with its corporate headquarters

14  located at 5900 N. Andrews Avenue, Suite 1100, Fort Lauderdale, FL 33309.

15  32.  Fontem Holdings 4 B.V. is a business venture based in the Netherlands.

16  33.  Plaintiffs allege, on information and belief, that at all times herein,

17  Defendants' agents, employees, representatives, executives, directors, partners,

18  and/or subsidiaries were acting within the course and scope of such agency,

19  employment, and representation, on behalf of Defendants.

20  34.  DOES 1 to 10, inclusive are now, and/or at all times mentioned in this

21  Complaint were licensed to do business and/or actually doing business in the State

22  of California.  Plaintiffs do not know the true names or capacities, whether

23  individual, partner or corporate, of DOES 1 to 10, inclusive and for that reason,

24  DOES 1 to 10 are sued under such fictitious names.  Plaintiffs will seek leave of

25  court to amend this Complaint to allege such names and capacities as soon as they are

26  ascertained.

27  35.  Defendants, and each of them, are now, and/or at all times mentioned in

28  this SCAC were in some manner legally responsible for the events, happenings and

- 15 -

circumstances alleged in this SCAC.  Defendants proximately caused Plaintiffs, all others similarly situated and the general public to be subjected to the unlawful practices, wrongs, complaints, injuries, and/or damages alleged in this SCAC. Defendants, and each of them, are now, and/or at all times mentioned in this SCAC were the agents, servants, and/or employees of some or all other Defendants, and vice-versa, and in doing the things alleged in this SCAC, Defendants are now and/or at all times mentioned in this SCAC were acting within the course and scope of that agency, servitude, and/or employment.

36.     Defendants, and each of them, are now, and/or at all times mentioned in this Complaint were members of, and/or engaged in, a joint venture, partnership and common enterprise, and acting within the course and scope of, and in pursuance of said joint venture, partnership, and common enterprise.   Furthermore, each defendant, may have been the alter ego and acting in the same or similar capacity as Defendants, in the treatment of Plaintiffs, such that it would be unjust to provide separate legal treatment of said Defendants and DOES 1-10, who, at all relevant times, acted jointly and severally to deprive Plaintiffs of their rights under the laws of California, New York, and Illinois.  Defendants, and each of them, at all times mentioned in this Complaint concurred and contributed to the various acts and omissions of each and every one of the other Defendants in proximately causing the complaints, injuries, and/or damages alleged in this Complaint.  Defendants, and each of them, at all times mentioned in this Complaint approved of, condoned and/or otherwise ratified each and every one of the acts and/or omissions alleged in this Complaint.

37.     Defendants, and each of them, at all times mentioned in this Complaint aided and abetted the acts and omissions of each and every one of the other Defendants thereby proximately causing the damages alleged in this Complaint.

SECOND CONSOLIDATED AMENDED COMPLAINT

# IV.    FACTUAL ALLEGATIONS

## A.    Electronic Cigarettes

38.    This action concerns BLU E-Cigarettes sold, marketed and distributed by Defendants.

39.    An electronic cigarette, or e-cigarette, is a device that simulates tobacco smoking. E-cigarettes are designed to deliver a smoking-like "hit" of what E-cigarette producers claim is vapor, usually containing nicotine, which is inhaled by the user. They work through the use of a battery operated heating mechanism, which typically converts a cartridge of solvent carriers containing glycerin, glycol, propylene glycol, polyethylene glycol (also found in anti-freeze), natural, and artificial flavors, and in most e-cigarettes, various proportions of nicotine, into vapor. When a person inhales ("vapes") from an e-cigarette, this mimics the taking of a "drag" on a traditional tobacco cigarette. A heating device is activated, the solution is converted into vapor, and the consumer breathes it in. Both the activation of this heating element and the process of vaporizing the e-cig liquids that follows this heating activation are independently linked to the production of OX/ROS or reactive oxidative species which incurs measureable amounts of oxidative stress in cells exposed to e-cigarettes and their "vapors."[4] Many e-cigarettes, including those manufactured by Defendants, are similar in shape and size to traditional cigarettes:

///

///

///

///

---

[4] Public Library of Science, *Vapors Produced by Electronic Cigarettes and E-Juices with Flavorings Induce Toxicity, Oxidative Stress, and Inflammatory Response in Lung Epithelial Cells and in Mouse Lung*, San Francisco, CA 2015.

40.     As a result of aggressive and unrestricted marketing, increased restrictions on the use of traditional cigarettes, and a perception that e-cigarettes are "healthy" alternatives to traditional smoking, e-cigarette use has exploded since their introduction in the U.S. in 2007.[5]  Despite the perception of these devices as a "healthy" alternative, studies reveal multiple problems with e-cigarette device use including health risks to the user, the adverse impact on the health and safety of children, teens, and young adults, and a lack of scientific evidence showing that e-cigarettes are effective smoking cessation devices or that they reduce cigarette consumption.

---

[5] *See* Ron Chapman, MD, MPH, California Department of Public Health, California Tobacco Control Program, State Health Officer's Report on E-Cigarettes: A Community Health Threat, (January 2015), at 6, http://www.cdph.ca.gov/programs/tobacco/Documents/Media/State%20Health-e-cig%20report.pdf.

SECOND CONSOLIDATED AMENDED COMPLAINT

41.     Defendants mislead their consumers by omitting material facts and making fraudulent partial misrepresentations on their packaging. Defendants failed to disclose to consumers that they are inhaling a concoction of chemicals (including formaldehyde) toxic to humans in the form of an aerosol.     Unlike vapor—which is the natural gaseous state of a substance, element, or compound—users of BLU E-Cigarettes inhale an aerosol containing suspended particulate matter, and then exhale them into the environment, potentially causing second hand harm to bystanders.  Mainstream and second hand e-cigarette aerosol has been found to contain a number of harmful chemicals.[6]  These harmful chemicals are inhaled by the consumers and then are released into the environment causing significant second-hand harm to those exposed.  The National Center for Biotechnological Information published in-depth studies that prove the existence of these harmful additives in e-cig products like BLUs, and condensed their data into numerous charts so it can be accurately understood that these products exist in aerosol generated by e-cigarettes and pose a significant threat to human health.[7]

42.     According to a 2011 study by the Centers for Disease Control and Prevention ("CDC"), as of that year, more than one fifth of smokers in the United States had tried electronic cigarettes, and 6% of all adults had tried them.[8] According to a subsequent study by the CDC, nearly 1.8 million middle and high school students tried e-cigarettes in 2011 and 2012, including approximately

---

[6] California Department of Public Health, California Tobacco Control Program, *State Health Officer's Report on E-Cigarettes: A Community Health Threat*, Sacramento, CA 2015.

[7] Cheng, Tianrong. National Center for Biotechnology Information, U.S. National Library of Medicine, *Chemical Evaluation of Electronic Cigarettes*, Bethesda, MD 2014.

[8]   Press Release, Centers for Disease Control and Prevention, *About one in five U.S. adult smokers have tried an electronic cigarette* (Feb. 28, 2013), http://www.cdc.gov/media/releases/2013/p0228_electronic_cigarettes.html.

SECOND CONSOLIDATED AMENDED COMPLAINT

160,000 students who had never used conventional cigarettes.[9]   The study also found that the number of U.S. middle and high school student e-smokers doubled between 2011 and 2012.[10]  Due to Defendants' failure to disclose the true negative health effects related to smoking BLU E-Cigarettes, the youth of today feel safe smoking BLUs and are widely unaware of the risks associated with them due to the lack of disclosures and fraudulent partial misrepresentations in their labelling. Defendants and other electronic cigarette companies are using very similar marketing tactics as Big Tobacco companies did before the negative health effects of their products became widely known and tobacco regulations became strictly enforced.  The aim of Defendants by concealing these material facts and making these partial representations is to deliberately undermine the smoke free social norms that took years to establish.

43.    However, one can reasonably infer from scientific evidence of the effects of the harmful ingredients these products contain, that these products are not safe or healthy.  By misbranding this carcinogenic liquid as a juice, people are misled into believing that Defendants' e-cig juice is healthy, and Defendants are able to make their products more appealing toward teens and young people who tend to be the most allured by flavor.  Although non-flavored e-cigarettes pose a significant human health risk, flavored e-cigarettes have been scientifically linked to even higher health risks than traditional tobacco flavorings, yet these types of e-cigarettes are being used most by the youth of today.  Defendants and other e-cigarette companies have engineered and ramped up a large-scale marketing campaign for flavored e-cigarettes and an alarming amount of kids and teenagers

---

[9] Morbidity and Mortality Weekly Report, Centers for Disease Control and Prevention, *Notes from the Field: Electronic Cigarette Use Among Middle and High School Students — United States, 2011–2012* (Sept. 6, 2013), http://www.cdc.gov/mmwr/preview/mmwrhtml/mm6235a6.htm.

[10] *Id.*

SECOND CONSOLIDATED AMENDED COMPLAINT

have been experimenting with these potentially dangerous and addictive products as a result.

44.    According to analysts, sales of e-cigarettes in America in 2012 were between $300 million and $500 million.[11]  This was approximately double what they were in the preceding year,[12] and sales more than doubled to $1.5 billion in 2013.[13] In 2014, sales reached $7 billion.[14]

45.    BLUs (including related paraphernalia) sell for a range of prices.  As of the filing of the original complaint, BLUs and related paraphernalia can be purchased at stores throughout the United States, including California, New York, and Illinois, as well as on Defendants' website.

46.    On information and belief, most members of the proposed Classes have bought more than one of Defendants' BLUs.

**B.    The Food And Drug Administration ("FDA") Recently Enacted Regulations Governing E-Cigarettes, But The FDA Expressly Stated That Its New Regulations Do Not Preempt State Law, Including Proposition 65.**

47.    On May 10, 2016, the FDA published its Final Rule Deeming Tobacco Products To Be Subject to the Federal Food, Drug, and Cosmetic Act ("FD&C Act"), as Amended by the Family Smoking Prevention and Tobacco Control Act; Restrictions on the Sale and Distribution of Tobacco Products and Required Warning Statements for Tobacco Products (the "Rule"), and published public

---

[11] *See E-cigarettes: Vape 'Em if You Got 'Em*, The Economist, Mar. 23, 2013.

[12] *Id.*

[13] Horizon Investments, *E-Cigarettes: Proposed Regulations Could Prove To Be A Game Changer*, Seeking Alpha, May 25, 2014.

[14] Peter Evans, *E-Cigarette Makers Face Rise of Fakes*, Wall Street Journal (Feb. 20, 2015), http://www.wsj.com/articles/e-cigarette-makers-face-rise-of-counterfeits-1424441348.

comment and response.    (Available at http://federalregister.gov/a/2016-10685.) According to the Executive Summary (at 28975):

> This final rule has two purposes: (1) To deem all products that meet the definition of "tobacco product" under the law and subject them to the tobacco control authorities in chapter IX of the FD&C Act and FDA's implementing regulations; and (2) to establish specific restrictions that are appropriate for the protection of the public health for the newly deemed tobacco products. … Such products include e-cigarettes.

Rule at 28975, 28976.

48.    The document further states: "Once deemed, tobacco products become subject to the FD&C Act and its implementing regulations.   The FD&C Act requirements that will apply to newly deemed products include establishment registration and product listing, ingredient listing, HPHC testing and reporting, premarket submissions prior to the introduction of new products, and labeling requirements.   Free samples of newly deemed tobacco products will also be prohibited.   The additional provisions of this final rule include minimum age and identification requirements, vending machine restrictions, and required warning statements for packages and advertisements [regarding nicotine]." *Id*. at 28980.

49.    The Rule expressly states that it does not preempt existing state requirements: "No State or local laws in effect at the close of the comment period were identified that FDA determined would be preempted by this final rule." *Id*. at 28989.   The heading of the applicable section, Part 1143, was specifically changed from "Required Warning Statements" to "Minimum Required Warning Statements" to make it clear that the Rule does not preempt any state law requirements.   *Id*. These non-preempted state laws specifically include Proposition 65.  *Id*.

**C.    Despite Knowing That The Aerosol Emitted By BLU E-Cigarettes Contains Formaldehyde And Other Harmful Carcinogens,**

- 22 -

**Defendants Intentionally Concealed These Dangers From Consumers.**

**1.     Defendants Are, And Have Been, Well Aware That Formaldehyde And Other Harmful Chemicals Are Present in The Aerosol Produced by BLU E-Cigarettes.**

50.     In August 2014, Defendant Lorillard submitted comments on the FDA's proposed Deeming Rule which discussed in detail the presence of formaldehyde and other harmful chemicals in e-cigarette aerosol.  *See* FDA Docket No. FDA-2014-N-0189-75849 (August 7, 2014), at 38-49 *available at* https://www.regulations.gov/#!documentDetail;D=FDA-2014-N-0189-75849.  In its comments, Lorillard acknowledged its awareness of the FDA's 2009 report (referenced below, ¶ 56) showing that e-cigarette aerosol contains known carcinogens and other toxic chemicals.  *See id.* 24 n. 43; *see also id.* at 14 n. 16. Lorillard further stated that it acquired the BLU E-Cigarette brand in 2012, and thereafter it took certain steps to address the health and safety concerns raised by the FDA.  Specifically, Lorillard stated that it took on the responsibility of ensuring the safety of its BLU E-Cigarettes, including the safety of constituents in the aerosol produced by such products.  *Id.* at 9-12.

51.     As part of Lorillard's alleged "stewardship program" with respect to the BLU E-Cigarettes, Lorillard admitted that it had "conducted various toxicological, environmental and clinical testing of [BLU E-Cigarettes] to assess product safety," including conducting the following:

- "a toxicology assessment of the e-liquid and aerosol of certain [BLU E-Cigarettes]"; and

- "aerosol testing using a modified smoking machine to measure the level of certain smoke constituents in the aerosol of certain [BLU E-Cigarettes]."

- 23 -

*Id.* at 10-11.  Lorillard stated that it intended to publish the results of this research (*id.* at 12) but, nearly two years later, neither Lorillard nor any other Defendant has done so.

52.     Lorillard's comment included reviews of a host of studies that were published in the several years preceding its filing, many of which found potential risks associated with e-cigarette use.  Lorillard's conclusion concerning these studies was that there are "level[s] of toxicants in electronic cigarettes" but such levels are lower than the toxicants found in the smoke of conventional cigarettes. E.g. *id.* at 14.  Defendants apparently believe that although BLU E-Cigarettes expose users to harmful chemicals, Defendants have no obligation to inform users of the risks or exposure.  Tobacco, however, is the single greatest cause of preventable illness and premature death in the United States.  A product may be less risky than tobacco and still pose material risks of which a consumer would want, and has a right, to be informed.

53.     Defendants are also well aware of the presence of formaldehyde in the aerosol produced by BLU E-Cigarettes through their membership and participation in the Cooperation Centre for Scientific Research Relative to Tobacco ("CORESTA").  CORESTA is a membership organization consisting of a number of major tobacco and e-cigarette companies that was formed to conduct and respond to scientific research relating to tobacco products and health.  Defendant Fontem's parent company, Imperial Tobacco Ltd., is one of CORESTA's thirteen Board Member Organizations which are responsible for governing the organization.  In 2013, CORESTA formed an E-Cigarette Task Force ("Task Force") in order to, among other things, "gather and share preliminary data on analysis relevant to e-cigarettes with a view to making recommendations for product testing." https://www.coresta.org/groups/e-cigarettes.  Indeed, one of the principal aims of the Task Force was to develop a methodology for testing the aerosol produced by e-cigarettes.  *Id.*  Defendant Lorillard is not only a member of the Task Force, but one

of its employees was the Task Force Secretary.   Although the Task Force has published a technical report and recommended test protocol regarding the collection of data on constituents in e-cigarette aerosol, Defendants have never published any of the results of the testing on e-cigarette aerosol performed by CORESTA pursuant to the Task Force's test protocol.

54.     Clearly, based on these facts alone, Defendants are fully aware that their BLU E-Cigarettes are emitting aerosol that contains harmful and toxic carcinogens, have admittedly performed studies to confirm those findings, but have failed to disclose those findings to the consuming public. Defendants are intentionally and actively concealing the results of these studies because they know that if those studies were disclosed to the public, they would affect their sales, putting profits over safety.

**2.     Independent Studies Published by Other Reliable Sources Have Confirmed That E-Cigarettes, Specifically BLU E-Cigarettes, Emit Harmful, Cancer Causing Carcinogens.**

55.     Because of the rapid growth in the use of electronic cigarettes by consumers in recent years, an increasing number of government agencies and research facilities have begun to conduct studies concerning the potential health impact and risks of these devices.   These studies have found, *inter alia*: (a) measurable amounts of carcinogens, toxins, and other contaminants in e-cigarettes that are, or potentially are, disease-causing; (b) harmful potential side effects of e-cigarettes; and (c) that more study is needed to determine the full range of health dangers of e-cigarettes.

56.     In 2009, the United States Food and Drug Administration ("FDA") conducted a study of two brands of cigarettes.[15]    The FDA issued a summary of the results of that study,[16] making, *inter alia*, the statements in the following block quotes (language in brackets added):

- [the] FDA's Center for Drug Evaluation, Office of Compliance purchased two samples of electronic cigarettes and components from two leading brands.   These samples included 18 of the various flavored, nicotine, and no-nicotine cartridges offered for use with these products.  These cartridges were obtained in order to test some of the ingredients contained in them and inhaled by users of electronic cigarettes.

- FDA's Center for Drug Evaluation, Division of Pharmaceutical Analysis (DPA) analyzed the cartridges from these electronic cigarettes for nicotine content and for the presence of other tobacco constituents, some of which are known to be harmful to humans, including those that are potentially carcinogenic or mutagenic.

- DPA's analysis of the electronic cigarette samples *showed that the product contained detectable levels of known carcinogens and toxic chemicals to which users could potentially be exposed*.  [Emphasis added.]

- DPA's testing also suggested that *quality control processes used to manufacture these products are inconsistent or non-existent*. [Emphasis added.]

---

[15] *See* FDA Evaluation of E-cigarettes, DPATR-FY-09-23, available at http://www.fda.gov/downloads/drugs/scienceresearch/ucm173250.pdf.  The brands tested were not BLUs but contain similar primary ingredients to BLUs.

[16] http://www.fda.gov/NewsEvents/PublicHealthFocus/ucm173146.

SECOND CONSOLIDATED AMENDED COMPLAINT

- Specifically, DPA's analysis of the electronic cigarette cartridges from the two leading brands revealed the following:

    - ***Certain tobacco-specific nitrosamines which are human carcinogens were detected in half of the samples tested***.

    - ***Tobacco-specific impurities suspected of being harmful to humans—anabasine, myosmine, and β-nicotyrine—were detected in a majority of the samples tested***.

    - Three different electronic cigarette cartridges with the same label were tested and each cartridge emitted a markedly different amount of nicotine with each puff.  The nicotine levels per puff ranged from 26.8 to 43.2 mcg nicotine/100 mL puff.  [Emphasis added.]

57.    The FDA issued a contemporaneous consumer health brochure titled, "FDA Warns of Health Risks Posed by E-Cigarettes,"[17] in which Margaret A. Hamburg, M.D., commissioner of food and drugs, stated, "The FDA is concerned about the safety of these products and how they are marketed to the public."  The FDA also issued a safety alert[18] repeating the risks and noting that "[t]hese products do not contain any health warnings comparable to FDA-approved nicotine replacement products or conventional cigarettes."

58.    Indeed, in the FDA's 2009 study, all four of the major tobacco-specific nitrosamines, N-nitrosonicotine (NNN), N-nitrosoanabasine (NAB), N-nitrosoanatabine (NAT) and 4-(methylnitrosamino)-1-(3-pyridyl)-1-butanone (NNK), were found in e-cigarette cartridges.

---

[17]Retrievable at
http://www.fda.gov/ForConsumers/ConsumerUpdates/ucm173401.htm.

[18] Retrievable at
http://www.fda.gov/%20NewsEvents/Newsroom/PressAnnouncements/ucm173222.htm.

59.    Since the FDA released the results of its 2009 study and its concomitant warning concerning e-cigarettes generally, new studies have been emerging discussing the risks and dangers of e-cigarettes.  These studies have concerned a variety of brands and products, including Defendants' BLU E-Cigarettes; however, because e-cigarettes generally operate in a similar manner, and contain similar primary ingredients, even those studies which are not identified below as directly having reviewed BLUs are relevant hereto.

60.    The health risks and unknowns concerning e-cigarettes are compounded by the reality that e-cigarette users smoke differently than traditional smokers.  For example, a study of eight traditional and four e-cigarettes found, *inter alia*, that, e-cigarettes "***required a stronger vacuum [inhalation strength] to smoke than conventional [tobacco] brands***."    Trtchounian, A., *Conventional and Electronic cigarettes (e-cigarettes) have different smoking characteristics*, Nic. & Tob. Res., Vol. 12, No. 9 (Sept. 2010), at 911.[19]  (Emphasis added.)  The study states, "the effects of this on human health could be adverse." *Id.* at 905.  According to researchers, as a general matter, stronger puffing has the potential for "leading to cancer in the deeper lung regions." *Lung Deposition Analyses of Inhaled Toxic Aerosols in Conventional and Less Harmful Cigarette Smoke: A Review*, International Journal of Environmental Research and Public Health, September 23, 2013.[20]

61.    Another 2010 study found various kinds of carbonyls, including acrolein and formaldehyde, in e-cigarette samples, and found that "High concentrations of hazardous pollutants such as formaldehyde, acetaldehyde and

---

[19]  Retrievable at http://edge.rit.edu/content/P12056/public/e%20cig%20vs%20conventional%20cig.pdf.

[20] Retrievable at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3799535/

SECOND CONSOLIDATED AMENDED COMPLAINT

acrolein were detected by using the" testing system that those researchers had developed.[21]

62.    E-cigarettes are a subject of concern to major international entities. According to a presentation given by the World Health Organization ("WHO") to the European Parliament at a Workshop on Electronic Cigarettes on May 7, 2013, "electronic cigarettes are a controversial issue for which additional studies and evidence are needed."   That presentation referenced recent findings from Turkey that:

> *indicate that propylene glycol and tobacco specific N-nitrosamines, a powerful carcinogen, were found in the majority of samples*. Toxins from the e-cigarette averaged around 20% of those of a regular cigarette.  It was also found that similarly labeled ENDS [Electronic Nicotine Delivery Systems] cartridges emit different amounts of nicotine, and a nicotine overdose may occur which can have serious side effects.  *There are currently no studies available on safety and efficacy of long-term e-cigarettes use*. (Emphasis added).

63.    A study conducted by The National Center for Biotechnological Information found that nicotine levels in END devices like BLU E-Cigarettes vary and are often mislabeled.  Thus the efficacy and consistency of nicotine yields and the delivery of nicotine is not uniform in products across the brand and labels on these products do not adequately reflect the actual quantity of nicotine levels found in these products.  As a result of these studies, this Center recommended that e-cigarette manufacturers like Defendants enforce greater quality standards in their products.

---

[21] S. Uchiyama, Y. Inaba and N. Kunugita, Determination of acrolein and other carbonyls in cigarette smoke using coupled silica cartridges impregnated with hydroquinone and 2,4-dinitrophenylhydrazine, Journal of Chromatography. 1217 (2010) 4383-4388.

SECOND CONSOLIDATED AMENDED COMPLAINT

64.    Scientists from the University of Athens, Greece also conducted a study using 32 participants that found "**using an e-cigarette caused an instant increase in airway resistance that lasted for 10 minutes** in the majority of the participants." Christian Nordqvist, *Electronic Cigarettes Harm The Lungs,* MedicalNewsToday.com (Sept. 3, 2012) (emphasis in original).

65.    Preliminary studies conducted by the California Department of Public Health have also shown that smoking e-cigarettes containing nicotine for just five minutes can cause similar lung irritation, inflammation, and effect on blood vessels as smoking a traditional cigarette, which poses a significant risk of heart attacks and cardiac problems. *See* State Health Officer's Report on E-Cigarettes: *A Community Health Threat*, published by the California Department of Public Health on January 28, 2015, p. 5.

66.    In July 2013, the WHO stated that "[m]ost ENDS [Electronic Nicotine Delivery Systems] contain large concentrations of propylene glycol, which is a known irritant when inhaled," that "[t]he testing of some of these products also suggests the presence of other toxic chemicals, aside from nicotine," and that the safety of these devices "has not been scientifically demonstrated."[22]

67.    Numerous other studies have been performed by universities and other research centers, and have reported similar concerns about the potential for health risks associated with electronic cigarettes.

---

[22] Available at http://www.who.int/tobacco/communications/statements/ electronic_cigarettes/en/.  *See also* Wieslander G., *Experimental exposure to propylene glycol mist in aviation emergency training: acute ocular and respiratory effects*, Occup Environ Med 58: 649-655, Choi H, (2010), *Common household chemicals and the allergy risks in pre-school age children,* PLoS One 5: e13423, and Moline JM, *Health effects evaluation of theatrical smoke, haze and pyrotechnics* (2000).  *See also* New Hampshire Department of Environmental Services, *Ethylene Glycol and Propylene Glycol: Health Information Summary*, Environmental Fact Sheet,

- 30 -
SECOND CONSOLIDATED AMENDED COMPLAINT

68.    For example, a 2013 report titled *Electronic Cigarettes – an Overview*, by the German Cancer Research Center,[23] which was based on a comprehensive review of literature in the field, found in summary as to "Product characteristics" (the following bullet pointed paragraphs are block quoted text):

- E-cigarettes cannot be rated as safe at the present time.

- Consumers do not have reliable information on product quality.

- Electronic cigarettes have various technical flaws (leaking cartridges, accidental intake of nicotine when replacing cartridges, possibility of unintended overdose.)

- Some manufacturers provide insufficient and partly wrong information about their liquids.

As to "Health Effects," the summary stated (the following bullet pointed paragraphs are block quoted text):

- The liquids contain ingredients that on short-term irritate air- ways and may lead to allergic reactions and which may be harmful to health when inhaled repeatedly over a prolonged period of time.

- The aerosol of some liquids contains harmful substances (formaldehyde, acetaldehyde, acrolein, diethylene glycol, nickel, chromium, lead).

- The functionality of electronic cigarettes can vary considerably (aerosol production, nicotine delivery into aerosols).

- Adverse health effects for third parties exposed cannot be excluded because the use of electronic cigarettes leads to emission of fine and ultrafine inhalable liquid particles [otherwise known as volatile

---

[23] Published in Red Series, Tobacco Prevention and Tobacco Control, Vol. 19: Electronic Cigarettes – An Overview (Heidelberg 2013), available at http:www.dkfz.de/en/presse/download/RS-Vol. 19-E-Cigarettes-EN/pdf.

SECOND CONSOLIDATED AMENDED COMPLAINT

organic compounds (VOCs) that can travel deep into the lungs and cause severe inflammation].  These products also emit nicotine and cancer-causing substances into indoor air.

69.   Among the more specific risks identified by the German Cancer Research Center are that, *inter alia* (the following bullet pointed paragraphs are block quoted text, the language in brackets has been added, and all internal citations are omitted):

- Electronic cigarettes do not extinguish naturally after about ten puffs like conventional cigarettes, but can be used for hundreds of puffs without a break.  When using them as intended, consumers may therefore get a dangerous amount of nicotine by taking too many puffs, which may even result in serious symptoms of nicotine poisoning.  [*Id.* at 4-5.]

- Not even nicotine-free liquids are necessarily harmless.  Their main ingredients (propylene glycol, glycerine, flavours) have been approved for use in food, but this does not necessarily mean that they are also safe when they are repeatedly inhaled over a prolonged period of time – as they are when used in electronic cigarettes.  There are currently no studies available on the effects of long-term use of e-cigarettes.  [*Id.* at 7.]

- To date, only [a] few studies have been conducted on potential health risks associated with inhaling propylene glycol – as one does when using electronic cigarettes as intended.  According to these studies, inhaling propylene glycol may affect airways.  Short-term exposure to propylene glycol in indoor air (309 mg/m$^3$ for one minute) already causes irritations in the eyes, throat, and airways.  Long-term exposure to propylene glycol in indoor air may raise children's risk of developing asthma.  People who have frequently

- 32 -

been exposed to theatrical fogs containing propylene glycol are more likely to suffer from respiratory, throat, and nose irritations than do unexposed people.  We may therefore assume that the use of e-cigarettes, which involves inhaling propylene glycol vapours several times daily, may cause respiratory irritations.  This applies, in particular, to individuals with impaired airways and to smokers who switch to e-cigarettes or use them additionally, because smokers usually already have impaired airways.  [*Id.*]

- Glycerine is considered generally safe for oral intake and is used in food production as a humectant and as a solution carrier in flavors. However, this does not necessarily mean that it is also safe for inhalation – as in e-cigarettes if used as intended.  These concerns are not unfounded.  The specialist journal Chest reports about a case study of a patient with lipoid pneumonia caused by glycerine-based oils from the aerosol of electronic cigarettes.  The link appears to be clear, since symptoms disappeared when the patient stopped using electronic cigarettes.  [*Id.* at 7-8.]

- Individual liquids were found to contain small amounts of nitrosamines.  In addition, formaldehyde, acetaldehyde and acrolein were measured in the aerosol of various e-cigarettes, although considerably less than in cigarette smoke.  Formaldehyde and acrolein were only found in glycerine-containing liquids; they probably form upon heating of glycerine.  Acrolein is absorbed by the user: A decomposition product of acrolein was detected in the urine of e-cigarettes users, although considerably less than after smoking conventional cigarettes.  In addition, nickel and chromium were detected in the aerosol, with higher levels of nickel measured than it is known to be present in cigarette smoke.  The

SECOND CONSOLIDATED AMENDED COMPLAINT

aforementioned substances have been classified by the German Research Foundation (Deutsche Forschungsge-meinschaft, DFG) and the International Agency for Research on Cancer (IARC) as carcinogenic.  Since there is no safe threshold value for these substances, it cannot be excluded that using electronic cigarettes increases cancer risk, even though these substances may be present in very small amounts.  [*Id*.]

- Data on the impact of e-cigarette use on pulmonary function are not conclusive.  A study involving 30 participants reports adverse effects on pulmonary function after using an electronic cigarette for five minutes; however, the long-term pulmonary effects of e-cigarette use are unknown at the present time.  [*Id*.]

- There are currently no studies available on the effects of long-term use of e-cigarettes.  [*Id.* at 7.]

70.    Some of the many studies considered in the above-referenced Red Series review are among those discussed in more detail in the individual study references below.  One such study was *Short-term Pulmonary Effects of Using an Electronic Cigarette*, published in June 2012 in Chest, the journal of the American College of Chest Physicians.  That study expressly found both that e-cigarettes had adverse health effects and the need for further research:

> ***E-cigarettes assessed in the context of this study were found to have immediate adverse physiologic effects after short-term use that are similar to some of the effects seen with tobacco smoking***; however, the long-term health effects of e-cigarette use are unknown but potentially adverse and worthy of further investigation.  [Emphasis added.]

///

///

SECOND CONSOLIDATED AMENDED COMPLAINT

71.     A French article published in the consumer publication *60 millions de consommateurs* on August 26, 2013, reported that e-cigarettes are potentially carcinogenic.  It based its findings upon testing 10 different models of e-cigarettes.[24] It found "carcinogenic molecules in a significant amount" in the vapor produced in the products.  It further determined that "[i]n three cases out of 10, for products with or without nicotine, the content of formaldehyde was as much as the levels found in some conventional cigarettes."   It found acrolein, a toxic molecule emitted in quantities "that exceeded the amount found in the smoke of some cigarettes." "Potentially toxic" trace metals were also discovered in some of the models.

72.     A study by scientists at the University of California Riverside, published on March 20, 2013 in the journal PLoS One, found that:

> one [unidentified] brand of e-cigarettes generates aerosols containing micron particles comprised of tin, silver, iron, nickel, aluminum and silicate, as well as nanoparticles containing tin, chromium and nickel, which are elements that cause respiratory distress and disease.  Those metals come from the wires inside the cartridge, while silicate particles may originate from the fiber glass [*sic*] wicks.

Williams, M., *et al.*, *Metal and Silicate Particles Including Nanoparticles Are Present in Electronic Cigarette Cartomizer Fluid and Aerosol,* PLoS ONE 8(3): e57987 (2013).

73.     Also, according to that study by the University of California at Riverside:

> A total of 22 elements were identified in EC [electronic cigarette] aerosol, and three of these elements (lead, nickel, and chromium)

---

[24] Quotes in this paragraph are derived from B. McPartland, "Report: e-cigarettes are 'potentially carcinogenic'" an article published in *The Local*, a source for "France's News in English," on August 26, 2013, describing this study.

SECOND CONSOLIDATED AMENDED COMPLAINT

appear on the FDA's "harmful and potentially harmful chemicals" list.  Lead and chromium concentrations in EC aerosols were within the range of conventional cigarettes, while nickel was about 2–100 times higher in concentration in EC aerosol than in Marlboro brand cigarettes (Table 1).  Adverse health effects in the respiratory and nervous systems can be produced by many of the elements in Table 1, and many of the respiratory and ocular symptoms caused by these elements have been reported by EC users in the Health and Safety Forum on the Electronic Cigarette Forum website (http://www.e-cigarette-forum.com/forum/health-safety-e-smoking/).   Although [a table reflecting this research] was constructed to emphasize the effects of the elements found in aerosol on the respiratory system, other systems, such as the cardiovascular and reproductive systems, can be affected by most of the elements in EC aerosol.  ***EC consumers should be aware of the metal and silicate particles in EC aerosol and the potential health risks associated with their inhalation***.  [Emphasis added.]

74.    A study published on September 23, 2013 in the International Journal of Environmental Research and Public Health titled, *Lung Deposition Analyses of Inhaled Toxic Aerosols in Conventional and Less Harmful Cigarette Smoke: A Review*, found that there were potential risks associated with e-cigarettes that were not a factor in traditional cigarettes, including "compensatory smoking (*i.e.*, stronger puffing) leading to cancer in the deeper lung regions," and that "[u]nknown reactions between some components in newly designed filters (or other new additives) may lead to the production of carcinogens or other toxicants."

75.    On December 15, 2013, the American Society for Cell Biology issued a press release concerning the findings of researchers at Brown University, who determined that, "Nicotine, the major addictive substance in cigarette smoke,

- 36 -

1  contributes to smokers' higher risk of developing atherosclerosis, the primary cause

2  of heart attacks," and that, as such, e-cigarettes, which contain nicotine, as BLUs do,

3  "may not significantly reduce risk for heart disease."[25]

4       76.    In an article published in the Contemporary Reviews in Cardiovascular

5  Medicine titled, *E-Cigarettes A Scientific Review,* on May 13, 2014, the authors

6  emphasized the importance of "assess[ing] e-cigarette toxicant exposure and …

7  health effects" to "protect[] the entire population—children and adults, smokers and

8  nonsmokers—in the context of how the tobacco industry is marketing and

9  promoting these products."   The authors noted based on empirical studies that

10 "[c]onsumer perceptions of the risks and benefits and decisions to use e-cigarettes

11 are heavily influenced by how they are marketed."   The authors also discussed the

12 secondhand exposure of e-cigarettes (the following bullet pointed paragraphs are

13 block quoted text, the language in brackets has been added, and all internal citations

14 are omitted):

15   •  E-cigarettes do not burn or smolder the way conventional

16      cigarettes do, so they do not emit side-stream smoke; however,

17      bystanders are exposed to aerosol exhaled by the user.

18   •  [While] [t]oxins in the e-cigarette aerosol were at much lower

19      levels compared with the conventional cigarette emissions[,] [the

20      studies] found … levels of formaldehyde, acetaldehyde, isoprene,

21      acetic acid, 2-butanodione, acetone, propanol, propylene glycol,

22      and diacetin (from flavoring), traces of apple oil (3-methylbutyl-3-

23

24  _____

25  [25] American Society for Cell Biology, "Nicotine drives cell invasion that contributes
    to plaque formation in coronary arteries, Research indicates e-cigarettes may not
26  significantly reduce risk for heart disease," Dec. 15, 2013, available at
    http://www.eurekalert.org/pub_releases/2013-12/asfc-ndc112613.php (last accessed
27  Jan. 7, 2014).

28

SECOND CONSOLIDATED AMENDED COMPLAINT

methylbutanoate), and nicotine (with differing levels depending on the specific protocols) emitted into the air.

- [While the toxicity level was lower in e-cigarettes studied,] the particle size distribution and number of particles delivered by e-cigarettes are similar to those of conventional cigarettes … Smokers exhale some of these particles, which exposes bystanders to "passive vaping."  Like cigarettes, e-cigarette particles are small enough to reach deep into the lungs and cross into the systemic circulation.  At a minimum, these studies show that e-cigarette aerosol is not merely "water vapor" as is often claimed in the marketing for these products. Tests on e-cigarettes show much lower levels of most toxicants, but not particles, than conventional cigarettes.  The thresholds for human toxicity of potential toxicants in e-cigarette vapor are not known, and the possibility of health risks to primary users of the products and those exposed passively to their emissions must be considered.

77.    According to a May 18, 2014 article,[26] researchers at the VA San Diego Healthcare System and the University of California, San Diego, tested the effects of e-cigarette vapor on live methicillin-resistant Staphylococcus aureus and human epithelial cells.   The researchers found that while e-cigarette vapor increases bacterial virulence, the vapor decreases the ability of human epithelial cells to kill pathogens. Thus, it was concluded that "even if e-cigarettes may not be as bad as tobacco, they still have measurable detrimental effects on health."

78.    Studies conducted by the Public Library of Science provided an in-depth study on additional adverse health effects of e-cigarettes and specifically used

_____

[26] *E-cigarettes may boost resistance of drug-resistant pathogens,* Eurekalert! (May 14, 2014).

SECOND CONSOLIDATED AMENDED COMPLAINT

BLUs as a part of their research.[27]   These studies linked these products to cellular oxidative stress and inflammation of cells exposed to aerosol emissions released by electronic cigarettes.  E-Cigarettes have been significantly linked to the production of reactive oxidative species (OX/ROS), especially in flavored cartridges like the ones sold by Defendants.   These studies found that consumption of e-cigarette aerosols increased the fluorescence intensity levels in exposed cells which have been linked to increased levels of OX/ROS.   OX/ROS has been shown to cause oxidative stress within cells and produces an injurious response in bodily processes.  E-cigarette aerosols have also affected cell viability and the high levels of fluorescent substances found in these aerosols produce an inflammatory response in human bronchial epithelial airway cells because they cause secretions of Il-8 and Il-6 which contributes to the bodily inflammatory response.  This condition has been proven to be further exacerbated by nicotine consumption.  When e-liquids were applied directly to lung fibroblasts there were significant signs of epithelial cell inflammation, cell stress, and other phenotypic abnormalities. Studies were conducted on mice to produce evidence of pulmonary inflammation as well by measuring their bronchoalveolar lavage fluid levels after 3 days of exposure to e-cigarette aerosols.  After the exposure the Il-6 levels in mice significantly increased and the increase of this interleukin has been strongly correlated with an increase in pulmonary inflammation.  Because BLUs were specifically among the brands tested in these studies, strong connections can be legitimized between smoking BLUs and experiencing these serious health issues.   Defendants' failure to disclose these material facts to the consuming public and lack of completely truthful labels on their products are deliberate and widely successful attempts to mislead consumers.

---

[27] *See* Qun Wu, et al., *Electronic Cigarette Liquid Increases Inflammation and Virus Infestion in Primary Human Airway Epithelial Cells*, PLoS ONE 9(9) (Sept. 22, 2014); *see also* Sussan TE, *et al.*, fn. 30, *infra*.

1   Defendants and other major e-cigarette companies justify these unethical business

2   practices by using unreliable studies that are conducted by private institutions by

3   people who have a stake in the e-cigarette industry.  This opens up the possibility of

4   an existing bias that has a significant effect on the results and interpretations of the

5   findings of these studies, putting the validity of the tests conducted into question.

6       79.    On May 15, 2014, the Nicotine & Tobacco Research published a study

7   titled, *Carbonyl Compounds in Electronic Cigarette Vapors – Effects of Nicotine*

8   *Solvent and Battery Output Voltage*.  Although BLUs were not one of the brands

9   studied, the study has significant implications on BLUs because the brands studied

10  contained the same primary ingredients used in BLUs (*i.e.*, glycerin and/or

11  propylene glycol).  The study performed by the Roswell Park Cancer Institute in

12  Buffalo, NY found that (the following bullet pointed paragraphs are block quoted

13  text):

14  - **Introduction:** Glycerin (VG) and propylene glycol (PG) are the
15     most common nicotine solvents used in e-cigarettes (ECs).  It has
16     been shown that at high temperatures both VG and PG undergo
17     decomposition to low molecular carbonyl compounds, including
18     the carcinogens: formaldehyde and acetaldehyde.  The aim of the
19     study was to evaluate how various product characteristics,
20     including nicotine solvent and battery output voltage, affect the
21     levels of carbonyls in EC vapor.

22  - **Methods:** Twelve carbonyl compounds were measured in vapors
23     from 10 commercially available nicotine solutions and from three
24     control solutions composed of pure glycerin, pure propylene
25     glycol, or a mixture of both solvents (50:50).  EC battery output
26     voltage was gradually modified from 3.2 to 4.8 V. Carbonyl
27     compounds were determined using HPLC/DAD method.

28

- 40 -
SECOND CONSOLIDATED AMENDED COMPLAINT

- **Results:** Formaldehyde and acetaldehyde were found in 8 of 13 samples. The amounts of formaldehyde and acetaldehyde in vapors from lower voltage EC were on average 13- and 807-fold lower than in tobacco smoke, respectively. The highest levels of carbonyls were observed in vapors generated from PG-based solutions. Increasing voltage from 3.2 to 4.8 V resulted in 4 to over 200 times increase in formaldehyde, acetaldehyde, and acetone levels. The levels of formaldehyde in vapors from high-voltage device were in the range of levels reported in tobacco smoke.

- **Conclusions:** Vapors from EC contain toxic and carcinogenic carbonyl compounds. Both solvent and battery output voltage significantly affect levels of carbonyl compounds in EC vapors. High-voltage EC may expose users to high levels of carbonyl compounds.

80.    A 2014 study also noted the dangers of e-cigarettes and the formation of formaldehyde. Published in Archives of Toxicology, this study found that e-cigarette vapor contained "similar levels of formaldehyde . . . compared to conventional cigarettes."[28]

81.    On January 28, 2015, the California Department of Public Health issued a Health Advisory summarizing the public health risks associated with electronic cigarettes and making recommendations for health care professionals. Under "Toxicity of E-cigarettes and Exposure to Emissions" the advisory states, in part:

---

[28] Christoph Hutzler et al., *Chemical hazards present in liquids and vapors of electronic cigarettes,* Arch Toxicol 88:1295-1308 (June 11, 2014).

- 41 -

SECOND CONSOLIDATED AMENDED COMPLAINT

- **The heated e-liquid forms an aerosol that contains high concentrations of ultrafine particles that are inhaled and become trapped in the lungs**.  Chemicals in the aerosol are absorbed through the blood stream and delivered directly to the brain and all body organs.  [Footnote omitted.]

- While several studies found lower levels of carcinogens in the e-cigarette aerosol compared to smoke emitted by traditional cigarettes, **both the mainstream and secondhand e-cigarette aerosol have been found to contain at least ten chemicals that are on California' Proposition 65 list of chemicals known to cause cancer, birth defects or other reproductive harm**, including acetaldehyde, benzene, cadmium, formaldehyde, isoprene, lead, nickel, nicotine, n-nitrosonornicotine, and toluene. [Emphasis added.]

- E-cigarette emissions are also a health concern for those exposed to secondhand aerosol.  Although not as dangerous as secondhand smoke from combustible tobacco products, people exposed to e-cigarette aerosol absorb nicotine at levels comparable to people exposed to secondhand smoke.  **E-cigarette emissions also contain volatile organic compounds (VOCs) and fine/ultrafine particles.  These ultrafine particles can travel deep into the lungs where they get trapped and may lead to tissue inflammation.** [Emphasis added.] [Footnote omitted.]

82.     The advisory also notes that "[p]reliminary studies show that using a nicotine-containing e-cigarette for just five minutes causes similar lung irritation, inflammation and effect on blood vessels as smoking a traditional cigarette, which may increase the risk of a heart attack."  With respect to cessation claims, the

- 42 -

advisory explains that "[t]here is no scientific evidence that e-cigarettes help smokers to successfully quit traditional cigarettes or that they reduce consumption of traditional cigarettes."  In fact, the advisory points out that the contrary is true:

> One study found that 89 percent of e-cigarette users are still using [regular cigarettes] one year later and another study found that e-cigarette users are a third less likely to quit cigarettes.  These studies suggest that e-cigarettes are effectively inhibiting people from successfully kicking their nicotine addiction.  In addition, dual use of cigarettes and e-cigarettes is continuing to rise, which may diminish any potential benefits of cutting back on traditional cigarettes. Continuing to smoke traditional cigarettes, while also using e-cigarettes, does not reduce the cardiovascular health risks. [Footnotes omitted.]

83.   In the recommendations to health care providers section, the advisory recommends that health care professionals "[a]dvise and warn e-cigarette users about toxicity of these products to themselves and those subjected to secondhand emissions."

84.   In January of 2015, a study demonstrated that e-cigarettes produce formaldehyde, which is present in the aerosol inhaled by users.[29]  The study explained that "[f]ormaldehyde is a known degradation product of propylene glycol that reacts with propylene glycol and glycerol during vaporization to produce hemiacetals [ ]."  The study found "more than 2% of the total solvent molecules have converted to formaldehyde-releasing agents, reaching concentrations higher than concentrations of nicotine.  This happens when propylene glycol and glycerol are heated in the presence of oxygen to temperatures reached by commercially

---

[29] R. Paul Jensen, et al., *Hidden Formaldehyde in E-Cigarette Aerosols,* New England Journal of Medicine, 372:392-394 (Jan. 22, 2015).

SECOND CONSOLIDATED AMENDED COMPLAINT

available e-cigarettes operating at high voltage." The study notes that "formaldehyde is an International Agency for Research on Cancer group 1 carcinogen."

85.    A 2015 study conducted on mice published in the Journal of the Public Library of Science found that nicotine could also be delivered to humans through second hand smoke, that inhalation of nicotine through e-cigarettes caused increases in cotinine levels in the blood similar to levels caused by tobacco smoke, and that the e-cigarette exposure caused an influx "in macrophages … similar to the inflammatory response after exposure to cigarette smoke.[30]

86.    Recently, a 2015-published study conducted by the Rochester Medical Center and the Rochester Institute of Technology specifically examined the health effects of BLU E-Cigarettes and one other e-cigarette brand on mice and concluded that "ENDS may be harmful and injurious by chronic consumption" and the "data clearly demonstrate[s] the lung toxicity and hazards of exposure to ENDS/e-cigarettes."[31]   Specifically, the authors found that:

- "[i]nhalation of nicotine [from e-cigarettes] is sufficient to increase cotinine levels in the blood which has been associated with tobacco smoke induced emphysema in mice,"
- e-liquids can mediate effects on lung cell morphology and affect viability,

---

[30] Sussan TE, *et al.* (2015) "Exposure to Electronic Cigarettes Impairs Pulmonary Anti-Bacterial and Anti-Viral Defenses in a Mouse Mode," PLoS ONE 10(2): e0116861, available at http://journals.plos.org/plosone/article?id=10.1371/journal.pone.0116861#pone.0116861.ref018.

[31] Lerner A.A, et al., *Vapors Produced by Electronic Cigarettes and E-Juices with Flavorings Induce Toxicity, Oxidate Stress, and Inflammatory Response in Lung Epithelial Cells and in Mouse Lung,* PLoS ONE, Feb. 6, 2015, at 23.

---

- 44 -

- e-cig aerosols can modulate levels of oxidative stress and inflammation markets in both lung cells and mouse lungs, and

- e-cig aerosols affect in vivo in lung glutathione redox physiology implicating oxidative stress.

87.   On May 15, 2015, the American Physiological Society published a study,[32] finding that the "results suggest that soluble components of e-Cig, including nicotine causing dose-dependent loss of lung endothelial barrier function, associated with oxidative stress and brisk inflammation."  The study showed that "nicotine and e-cig solutions or vapor condensates cause dose-dependent cell injury manifested by decreased barrier function and decreased cell proliferation *via* specific signaling pathways." *Id.*

88.   Recent independent testing of Defendants' BLU E-Cigarettes revealed what Defendants had already known: the presence of significant amounts of formaldehyde in the aerosol produced by BLUs.  Center for Environmental Health, *A Smoking Gun, Cancer-causing chemicals in e-cigarettes* (2015), http://www.ceh.org/wp-content/uploads/CEH-2015-report_A-Smoking-Gun-Cancer-Causing-Chemicals-in-E-Cigarettes.pdf.

89.   Because formaldehyde is present in the aerosol produced by BLUs, users of such products are exposed to formaldehyde by inhaling and/or ingesting the aerosol produced by the products, which is how the BLUs are ordinarily and intended to be used.

90.   As of May 27, 2015, researchers were still concluding that "[o]verall, the limited toxicology data on e-cigarettes in the public domain is insufficient to

---

[32] *Endothelial disruptive pro-inflammatory effects of nicotine and e-cigarette vapor exposures*, Am. J. Physiol. Lung Cell Mol. Physiol. (May 15, 2015).

SECOND CONSOLIDATED AMENDED COMPLAINT

allow a thorough toxicological evaluation of this new type of tobacco product [electronic cigarettes]."[33]

91.    While some of the adverse health effects and harmful exposures resulting from the use of BLU E-Cigarettes are known to a handful of researchers, such information is not available or known to ordinary consumers.  Defendants, on the other hand, were aware based on studies available to them that were performed as early as 2009-2010 as described above that BLU E-Cigarettes can cause dangerous respiratory issues and emit aerosol that contains harmful carcinogens, but failed to disclose those material facts to consumers because they knew if those facts were disclosed, consumers would either not buy their product or not pay the retail price charged by Defendants. Instead, Defendants made partial misrepresentations about the health effects related to the use of their products, including that Defendants warned consumers about the health effects related to nicotine, but not about the other dangers and harmful effects related to the use of their products, and disclosed the ingredients without disclosing the hidden ingredients caused by the heating of those ingredients or other harmful effects.  Therefore, Defendants have fraudulently misled and deceived Plaintiffs and members of the Classes by actively concealing material facts and making fraudulent partial misrepresentations and omissions.

**D.    Defendants' Packaging Contains Material Omissions and Fraudulent Partial Misrepresentations**

92.    During the Class Period, the packaging for BLU products, through warnings and labelling fraught with material omissions and fraudulent partial misrepresentations, conveys the impression that the product contains no meaningful health risks other than possibly those that are a direct result of nicotine.   The

---

[33] Michael S. Orr, *Electronic cigarettes in the USA: a summary of available toxicology data and suggestions for the future,* Tob. Control (May 27, 2015).

warning on BLUs' packaging only states that:

> blu eCigs® electronic cigarettes are not a smoking cessation product and have not been evaluated by the Food and Drug Administration, nor are they intended to treat, prevent or cure any disease or condition.  For their protection, please keep out of the reach of children and pets.

> CALIFORNIA PROPOSITION 65

> **Warning:** This product contains nicotine, a chemical known to the state of California to cause birth defects or other reproductive harm.

93.   During the Class Period, packages for BLUs contained the same or substantively similar warnings.

94.   Defendants utilized very small print on the back of the packaging which made it difficult for many people to read.  While Defendants did include some ingredients contained in BLUs, they did not disclose all material risks relating to the hidden ingredients in BLUs caused by heating those ingredients, which creates formaldehyde and other toxins, as described in detail above.  Defendants thus denied consumers at the point of sale the opportunity to decide for themselves whether the product was something they were willing to risk inhaling.

95.   By warning of certain risks relating to nicotine, this packaging implied that those are the only significant health-related risks related to BLU E-Cigarettes, as described above.  This is deceptive and misleading, as the package omitted reference to the other carcinogens, including formaldehyde and other toxins and impurities found in BLU E-Cigarettes.

96.   The package also did not reference the difference in inhalation behavior between vaping and traditional smoking that may cause additional problems for persons who use e-cigarettes, including BLU E-Cigarettes, as described above.

97.   On their official website, Defendants promise consumers to remain

- 47 -

transparent, ethical, and honest in all of their business, sales, and marketing tactics. However, incomplete and deceptive labels and warnings contradict this notion because Defendants knowingly listed the ingredients and a nicotine warning but left out key facts about their products that can pose significant threats to human health as described hereinabove.

98.    As further evidence of Defendants' attempts to actively conceal the risks of their BLU E-Cigarettes, Defendants' website tells consumers to ignore negative studies about E-Cigarettes as nothing more than media hype.   BLU's founder, Jason Healy, states[34]:

> A lot of people get misinformed. Readers "share" or "like" a story, inaccuracies spread like wildfire, and correcting the information becomes nearly impossible. Even after people find out the truth, the damage has already been done. Imagine what happens in the minds of the public when news reports, on an almost daily basis, have headlines like the following:
>
> - "9 Terribly Disturbing Things About Electronic Cigarettes"
> - "Electronic Cigarette Safety Clouded"
> - "Fire Marshal: E-Cigarette Batteries Cause Fires"
> - "E-Cigs Carry Harmful Side Effects For Smokers, Nonsmokers"
> -  "Dangers Of E-Cigarettes, What's Really In The Vapor?"
>
> You get the idea … sensationalism sells. You capture attention with a "shock and awe" headline. Some of the headlines above are from major media outlets, and others are from local news affiliates and

---

[34] http://www.blucigs.com/media-e-cigarettes/

SECOND CONSOLIDATED AMENDED COMPLAINT

blogs. But they are all blatantly anti-electronic cigarette, and the subject matter of the articles is often seriously flawed.

I say this because each article contains much speculation passed on as fact, misinformation falsely construed as science and logical fallacies presented as sound argument. The result is gross miseducation of the public, which is relying on these articles to contain accurate information.

I am sure many of you are aware of other scientific studies that treat electronic cigarettes in a more even-handed manner. Unfortunately, these studies don't generate the same attention-grabbing headlines as those I mention above. The recurrent major messages and themes are far more anti-electronic cigarette. So again, the general message the public is given about e-cigarettes is, in short, that they're "bad."

99.    For the reasons set forth *supra*, the material facts actively concealed by Defendants and misleading partial representations contained in BLUs packaging constitute an illegal and fraudulent pattern and practice by Defendants to deceive consumers into purchasing their BLU E-Cigarettes.

## V.    CLASS DEFINITIONS AND ALLEGATIONS

100.   Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure.  Plaintiffs bring this action on behalf of themselves and all members of the following classes (the "Classes") comprised of:

a. **All persons, exclusive of Defendants and their employees, who purchased in or from California one or more BLU E-Cigarettes sold by Defendants during the Class Period (the "California Class").**

- 49 -

b. **All persons, exclusive of Defendants and their employees, who purchased in or from New York one or more BLU E-Cigarettes sold by Defendants during the Class Period (the "New York Class")**

c. **All persons, exclusive of Defendants and their employees, who purchased in or from Illinois one or more BLU E-Cigarettes sold by Defendants during the Class Period (the "Illinois Class").**

101.   Plaintiffs reserve the right to modify or amend the definitions of the Classes after they have had an opportunity to conduct discovery.

102.   The Class Period for the California Class is from April 22, 2011 until the date of notice.

103.   The Class Period for the New York is from October 2, 2012 until the date of notice.

104.   The Class Period for the Illinois Class based on fraudulent concealment is from October 2, 2010 until the date of notice, and the Class Period for Illinois Class based on violation of the ICFA is October 2, 2012.

105.   ***Numerosity.  Rule 23(a)(1).***  The members of the Classes are so numerous that their individual joinder is impracticable.  Plaintiffs are informed and believe that the proposed Classes contain at least thousands of purchasers of the BLUs who have been damaged by Defendants' conduct as alleged herein.  The number of members of the proposed Classes is unknown to Plaintiffs but can be discerned from the records maintained by Defendants and retailers.

106.   ***Existence of Common Questions of Law and Fact.  Rule 23(a)(2).***  This action involves common questions of law and fact, which include, but are not limited to, the following:

a. Whether Defendants' labeling for BLUs discussed herein is true, or is reasonably likely to deceive, given the omissions of material fact and

1          partial misrepresentations described above;

2     b.  Whether Defendants' warnings on the packages of BLU E-Cigarettes

3        are misleading or are reasonably likely to deceive, given the omissions

4        of material fact and partial misrepresentations described above;

5     c.  Whether Defendants' conduct described herein constitutes a deceptive

6        act or practice in violation of the CLRA (California Class);

7     d.  Whether Defendants' conduct described herein constitutes an unlawful,

8        unfair, and/or fraudulent business practice in violation of the UCL

9        (California Class);

10     e.  Whether Defendants' conduct described herein constitutes unfair,

11        deceptive, untrue or misleading advertising in violation of the UCL

12        (California Class);

13     f.  Whether Defendants' conduct described herein constitutes unfair,

14        deceptive, untrue or misleading advertising in violation of the FAL

15        (California Class);

16     g.  Whether Defendants' conduct described herein constitutes a violation

17        of California's Proposition 65 (California Class);

18     h.  Whether Defendants' conduct described herein constitutes unfair or

19        deceptive acts or practices in violation of the GBL (New York Class);

20     i.  Whether Defendants' conduct described herein constitutes fraudulent

21        concealment in violation of Illinois law (Illinois Class);

22     j.  Whether Defendants' conduct described herein constitutes a violation

23        of the ICFA (Illinois Class);

24     k.  Whether Plaintiffs and the other members of the Classes are entitled to

25        damages; and

26     l.  Whether Plaintiffs and the Classes are entitled to injunctive relief,

27        restitution or other equitable relief and/or other relief as may be proper.

28

107. ***Typicality***. ***Rule 23(a)(3).***   All members of the Classes have been subject to and affected by the same conduct and omissions by Defendants.   The claims alleged herein are based on the same violations by Defendants that harmed Plaintiffs and members of the Classes.   By purchasing BLUs during the relevant time period, all members of the Classes were subjected to the same wrongful conduct.   Plaintiffs' claims are typical of the Classes' claims and do not conflict with the interests of any other members of the Classes.   Defendants' unlawful, unfair, deceptive, and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced.

108. ***Adequacy. Rule 23(a)(4).***   Plaintiffs will fairly and adequately protect the interests of the members of the Classes.   Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously.   Plaintiffs have no adverse or antagonistic interests to those of the Classes.

109. ***Predominance and Superiority of Class Action.   Rule 23(b)(3).***   Questions of law or fact common to the Classes predominate over any questions affecting only individual members and a class action is superior to other methods for the fast and efficient adjudication of this controversy, for at least the following reasons:

    a.    Absent a class action, members of the Classes as a practical matter will be unable to obtain redress, Defendants' violations of their legal obligations will continue without remedy, additional consumers will be harmed, and Defendants will continue to retain their ill-gotten gains;

    b.    It would be a substantial hardship for most individual members of the Classes if they were forced to prosecute individual actions;

    c.    When the liability of Defendants has been adjudicated, the Court will be able to determine the claims of all members of the Classes;

d.   A class action will permit an orderly and expeditious administration of each Class member's claims and foster economies of time, effort, and expense;

e.   A class action regarding the issues in this case does not create any problems of manageability; and

f.   Defendants have acted on grounds generally applicable to the members of the California, New York and Illinois Classes, making class-wide monetary relief appropriate.

110.   Notice to members of the putative Classes may be accomplished through publication, signs or placards at the point-of-sale, or other forms of distribution, if necessary, if the Classes are certified or if the Court otherwise determines class notice is required.   Plaintiffs will, if notice is so required, confer with Defendants and seek to present the Court with a stipulation and proposed order on the details of a class notice program.

## VI.   CAUSES OF ACTION

### COUNT I

**Injunctive Relief And Damages For Violations of The Consumers Legal Remedies Act
(Cal. Civil Code §§ 1750, *et seq.*)
(On Behalf of the California Plaintiffs and the California Class and Against Defendants)**

111.   The California Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

112.   The relevant period for this cause of action is four years from the date of filing of this Complaint until judgment is entered.

113.   This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.* ("CLRA" or the "Act"), which provides that enumerated listed "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to

- 53 -

1   result or which results in the sale or lease of goods or services to any consumer are

2   unlawful," CLRA § 1770, and that "[a]ny consumer who suffers any damage as a

3   result of the use or employment by any person of a method, act, or practice declared

4   to be unlawful by Section 1770 may bring an action against such person to recover

5   or obtain," various forms of relief, including injunction and damages.  Cal. Civ.

6   Code § 1780.

7         114.  This cause of action seeks injunctive relief and now also monetary

8   damages.  On April 16, 2015, Plaintiff Diek sent Defendants a CLRA notice letter

9   providing the notice required by California Civil Code § 1782(a).  Plaintiff Diek

10  sent the letter via certified mail, return receipt requested, to the location in Lake

11  Forest where Plaintiff Diek purchased some of his BLUs, as well as to Defendants'

12  principal place of business in Greensboro, NC, and to the Secretary of State of

13  California, advising Defendants that they are in violation of the CLRA and must

14  correct, replace or otherwise rectify the goods and/or services alleged to be in

15  violation of § 1770.  Defendants were further advised that in the event the relief

16  requested has not been provided within 30 days, Plaintiff Diek would amend his

17  Complaint to include a request for monetary damages pursuant to the CLRA.

18  Similarly, Plaintiff Whitney sent a notice of his intent to seek damages under the

19  CLRA on September 2, 2015.   Defendants have not corrected, replaced, or

20  otherwise rectified the goods and/or services alleged in either the CLRA letters or

21  this Complaint within the statutorily proscribed 30-day period.    Therefore,

22  California Plaintiffs seek both injunctive relief and monetary damages against

23  Defendants pursuant to the CLRA, California Civil Code §§ 1781 and 1782.

24        115.  California Plaintiffs were deceived by Defendants' unlawful practices

25  as described more fully above by actively concealing from consumers that BLU E-

26  Cigarettes emit aerosol with known carcinogens, toxins, and other potentially

27  harmful impurities (such as, among other things, formaldehyde),   California

28  Plaintiffs were also deceived by Defendants' omissions and fraudulent partial

representations relating to harm associated with the use of nicotine, and suppression of the other dangers and harm associated with the use of BLU E-Cigarettes.  Also undisclosed was the lack of additional research which such studies have determined is required to assess the full potential danger of electronic cigarettes, especially in long term users, and the serious dangerous respiratory issues associated with using BLU E-Cigarettes.

116.  Defendants' actions, omissions and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale of goods to consumers.

117.  Defendants marketed, sold and distributed BLUs in California during the relevant period.

118.  California Plaintiffs and members of the California Class are "consumers" as that term is defined by the CLRA in Cal. Civ. Code § 1761(d).

119.  Defendants' BLUs were and are "good[s]" within the meaning of Cal. Civ. Code §§ 1761(a) & (b).

120.  Defendants violated the CLRA by engaging in at least the following practices proscribed by California Civil Code § 1770(a) in transactions with the California Plaintiffs and the California Class which were intended to result, and did result, in the sale of BLUs:

> (5) Representing that [BLUs have] . . . approval, characteristics . . . uses [or] benefits . . . which [they do] not have . . . .
>
> ***
>
> (7) Representing that [BLUs are] of a particular standard, quality or grade . . . if [they are] of another.
>
> ***
>
> (9) Advertising goods . . . with intent not to sell them as advertised.

121.  As such, Defendants' conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices because they have and

- 55 -

1   continue to omit material facts which they knew, or should have known, would have

2   a material impact on a consumers' purchasing decision.

3          122.   The omitted information would have been material to a reasonable

4   consumer in his or her decision as to whether to purchase BLUs and/or purchase the

5   BLUs at the price at which they were offered.

6          123.   Defendants had a duty to disclose this information to California

7   Plaintiffs and the members of the California Class for several reasons.   First,

8   Defendants have a statutory obligation under Proposition 65 to provide clear and

9   reasonable warnings regarding the carcinogens contained in their products.   Second,

10  Defendants were aware at least as early as 2009, based on published studies

11  referenced *supra*, that their BLU E-Cigarettes emitted aerosol with known

12  carcinogens, toxins, and other impurities, while consumers were not reasonably in a

13  position to be aware of such studies.   Despite this knowledge, Defendants actively

14  concealed these material facts from the California Plaintiffs and the California

15  Class.   Third, while Defendants made certain specific representation about the risks

16  associated with nicotine, that representation is a misleading half-truth because it

17  implies that is the only risk relating to the product, when, in fact, it is not.

18  Moreover, disclosure of the ingredients without disclosing the hidden ingredients

19  and harmful effects of heating such ingredients is misleading and deceptive.

20         124.   Defendants provided the California Plaintiffs and the other California

21  Class members with BLUs that did not match the quality portrayed by their

22  marketing.

23         125.   As a result, the California Plaintiffs and members of the California

24  Class have suffered irreparable harm.   The California Plaintiffs and the other

25  California Class members' injuries were proximately caused by Defendants'

26  conduct as alleged herein. The California Plaintiffs, individually and on behalf of all

27  other California Class members, seek entry of an order enjoining Defendants from

28  continuing to employ the unlawful methods, acts and practices alleged herein

pursuant to California Civil Code section 1780(a)(2), awarding exemplary and punitive damages against Defendants pursuant to California Civil Code §§ 1780(a)(1) and (a)(4), and ordering the payment of damages, costs and attorneys' fees, and such other relief as deemed appropriate and proper by the Court under California Civil Code section 1780(a)(2).  If Defendants are not restrained from engaging in these practices in the future, the California Plaintiffs and the California Class will continue to suffer harm.

126.  Pursuant to section 1780(d) of the CLRA, the California Plaintiffs previously filed affidavits showing that this action has been commenced in the proper forum.

## COUNT II

**Injunctive And Equitable Relief For Violations of Unfair Competition Law**
**(Cal. Business & Professions Code §§ 17200, *et seq.*)**
**(On Behalf of the California Plaintiffs and the California Class and Against Defendants)**

127.  The California Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

128.  The relevant period for this cause of action is four years from the filing of this Complaint until judgment is entered.

129.  The Unfair Competition Law, Cal. Business & Professions Code § 17200, *et seq.* ("UCL"), prohibits any "unlawful," "unfair," or fraudulent business act or practice and any false or misleading advertising.

130.  In the course of conducting business, Defendants committed unlawful business practices by, *inter alia*, actively concealing and omitting material facts, as set forth more fully herein, and violating Cal. Civil Code § 1750, *et seq*. and making fraudulent partial misrepresentations.

131.  The California Plaintiffs, individually and on behalf of the California Class members, reserve the right to allege other violations of law which constitute other unlawful business acts or practices.  Such conduct is ongoing and continues to

1   this date.

2       132.  Defendants' actions constitute "unfair" business acts or practices

3   because, as alleged above, *inter alia*, Defendants have engaged and continue to

4   engage in fraudulent partial misrepresentations and actively concealment of material

5   facts regarding their BLUs, and thereby offended an established public policy, and

6   engaged in immoral, unethical, oppressive, and unscrupulous activities that are

7   substantially injurious to consumers.  This conduct constitutes violations of the

8   unfair prong of Business & Professions Code § 17200, *et seq*.

9       133.  Further, Defendants' failure to warn of the carcinogenic exposures

10  resulting from use of the BLUs is contrary to California law and policy, which

11  obligates Defendants to provide such information to consumers.

12      134.  Business & Professions Code § 17200, *et seq.*, also prohibits any

13  "fraudulent business act or practice."

14      135.  Defendants' actions, omissions, and partial misrepresentations, as

15  alleged herein, also constitute "fraudulent" business practices in violation of the

16  UCL because, among other things, they are false, misleading, and/or likely to

17  deceive reasonable consumers within the meaning of Business & Professions Code

18  § 17200, *et seq*.

19      136.  Defendants' failure to disclose that the BLU E-Cigarettes expose users

20  to formaldehyde violates the UCL's proscription against engaging in fraudulent

21  conduct.

22      137.  As more fully described above, Defendants' failure to warn the

23  California Plaintiffs and the California Class members that use of the BLU E-

24  Cigarettes would expose them to formaldehyde a hidden ingredient formed through

25  heating as the product is used, which is known to cause cancer, as well as other

26  toxins, is likely to deceive reasonable consumers.  Indeed, the California Plaintiffs

27  and the other members of the California Class were unquestionably deceived, as

28  Defendants' packaging and labeling of the BLU E-Cigarettes misrepresent and omit

the true facts about BLU E-Cigarettes, as described hereinabove, including listing ingredients but not including the hidden ingredients such as formaldehyde that are created when the product is heated during use, and falsely representing that the only negative health effects related to the use of BLU E-Cigarettes are certain ones caused by nicotine.   This includes the omissions and partial representations described in this complaint regarding serious respiratory issues.  Also undisclosed was the lack of additional research which such studies have determined is required to assess the full potential danger of electronic cigarettes, especially in long term users.  These acts constitute fraudulent and unfair business practices.

138.   There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

139.   As a result of Defendants' fraudulent partial misrepresentations and omissions as detailed herein, the California Plaintiffs and other members of the California Class have in fact been harmed as described above.  If Defendants had disclosed the information discussed above about BLUs and otherwise been truthful about their safety, the California Plaintiffs would not have purchased, or would have paid less for, Defendants' products.  Defendants were also able to charge more than what their BLUs would have been worth had they disclosed the truth about them.

140.   As a result of Defendants' unlawful, unfair, and fraudulent practices, the California Plaintiffs and the other California Class members have suffered injury in fact and lost money.   Had the California Plaintiffs and the California Class members known the true nature of the BLU E-Cigarettes, they would not have purchased them or they would have paid less for them.

141.   As a result of their deception, Defendants have been able to reap unjust revenue and profit in violation of the UCL.

142.   Unless restrained and enjoined, Defendants will continue to engage in the above-described conduct.  Accordingly, injunctive relief is appropriate for the California Plaintiffs and the California Class.

143.   As a result of Defendants' conduct in violation of the UCL, the California Plaintiffs and members of the California Class have been injured as alleged herein in amounts to be proven at trial because they purchased BLUs without full disclosure of the material facts discussed above.

144.   As a result, the California Plaintiffs, individually, and on behalf of the California Class, and the general public, seek restitution and disgorgement of all money obtained from the California Plaintiffs and the members of the California Class collected by Defendants as a result of unlawful, unfair, and/or fraudulent conduct, and seek injunctive relief, and all other relief this Court deems appropriate, consistent with Business & Professions Code § 17203.

## COUNT III

**Injunctive Relief And Damages For Violation of False Advertising Law for Deceptive, False And Misleading Advertising**
**(Cal. Bus. & Prof. Code §§ 17500, *et seq.*)**
**(On Behalf of the California Plaintiffs and the California Class and Against Defendants)**

145.   The California Plaintiffs repeat and reallege the allegations contained in the paragraphs above, as if fully set forth herein.

146.   The relevant period for this cause of action is four years from the filing of this Complaint until judgment is entered.

147.   Bus. & Prof. Code § 17500 states:

It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter, into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any

advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning such real or personal property or services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, *which is untrue or misleading*, *and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or for any such person, firm, or corporation to so make or disseminated or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell such personal property or services*, professional or otherwise, so advertised at the price stated therein, or as so advertised.

148.   To establish a violation of § 17500, the California Plaintiffs must show the following elements: (1) Defendants intended to dispose of personal property; and (2) Defendants publicly disseminated advertising which: (a) contained a statement which was untrue or misleading, and (b) which Defendants knew, or in the exercise of reasonable care should have known, was untrue or misleading, and (3) which concerned the personal property.

149.   Defendants disseminated through their product labeling and packaging that the only negative health affects related to the use of BLU E-Cigarettes is nicotine.  Defendants, however, failed to disclose all of the other material negative facts related to the use of BLU E-Cigarettes (such as the inhalation of formaldehyde and other carcinogens and toxins known to be emitted in the aerosol of BLUs). Defendants also failed to disclose the serious respiratory issues associated with using BLU E-Cigarettes.  Moreover, Defendants listed ingredients on the package but failure to disclose to users the hidden ingredients, such as formaldehyde, caused by heating of certain of the listed ingredients.  Also undisclosed was the lack of additional research which such studies have determined is required to assess the full

potential danger of electronic cigarettes, especially in long term users. Clearly, the disclosure of these other dangers and adverse health effects would have influenced a consumer's decision to use or buy their product. Defendants' omissions and fraudulent partial misrepresentation(s) reasonably deceived the California Plaintiffs and the California Class to purchase Defendants' BLUs.

150.   Defendants knew their labelling and packaging of BLU E-Cigarettes were misleading because of studies available to them as described herein above which revealed e-cigarettes emitted aerosol with known carcinogens and toxins and presented other respiratory dangers. Defendants owe the California Plaintiffs and the California Class a duty to exercise reasonable care to prevent the public dissemination of misleading and fraudulent misrepresentations contained on their packaging and labelling. Had Defendants exercised reasonable care, they could have prevented the public disclosure of false and misleading misrepresentations contained in their labelling and package of their BLUs, and therefore could have accurately and fully informed the California Plaintiffs and the California Class of their product, so they could make an informed decision on whether to use or purchase BLUs. Because Defendants publicly disseminated fraudulent and misleading representations in the labelling and packaging of their products, Defendants violated § 17500.

151.   Bus & Prof. Code § 17535 authorizes courts to enter injunctive relief against deceptive advertising and to award restitution:

> Any person, corporation, firm, partnership, joint stock company, or any other association, or organization which violates or proposes to violate this chapter may be enjoined by any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person, corporation, firm, partnership, joint stock company, or any other association or organization of any

practices which violate this chapter, or which may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of any practice in this chapter declared to be unlawful. Actions for injunction under this section may be prosecuted by the Attorney General or any district attorney, county counsel, city attorney, or city prosecutor in this state in the name of the people of the State of California upon their own complaint or upon the complaint of any board, officer, person, corporation or association or by any person acting for the interests of itself, its members or the general public.

152. The California Plaintiffs and the California Class are entitled to injunctive relief and therefore request the Court to issue an order enjoining Defendants from continuing to publicly disseminate their misleading representations in their labelling and packaging. The California Plaintiffs and the California Class are also entitled to a restitutionary award for monies deceptively acquired by Defendants through their misleading partial representations.

153. The injuries suffered by the California Plaintiffs and the California Class were directly and proximately caused by the unfair and deceptive acts and practices of Defendants, as more fully described herein.

154. The California Plaintiffs and the California Class seek a declaratory judgment and a court order enjoining the above-described wrongful acts and practices of Defendants.

155. Additionally, the California Plaintiffs and the California Class make claims for damages, attorneys' fees and costs.

## COUNT IV

**Injunctive And Equitable Relief For Violations of Unfair Competition Law (Cal. Business & Professions Code §§ 17200,** *et seq.* **based on Violations of Proposition 65)**
**(On Behalf Plaintiff Whitney and the California Class and Against Defendants)**

156.   The People of the State of California have declared by initiative under Proposition 65 their right "[t]o be informed about exposures to chemicals that cause cancer, birth defects, or other reproductive harm."   Proposition 65 § 1(b).

157.   To effectuate this goal, Proposition 65 prohibits exposing people to chemicals listed by the State of California as known to cause cancer, birth defects, or other reproductive harm without a "clear and reasonable warning" unless the business responsible for the exposure can prove that it fits within a statutory exemption.  Health & Safety Code § 25249.6 states, in pertinent part:

> No person in the course of doing business shall knowingly and intentionally expose any individual to a chemical known to the state to cause cancer or reproductive toxicity without first giving clear and reasonable warning to such individual. . .

158.   On January 1, 1988, the State of California officially listed formaldehyde as a chemical known to cause cancer. 27 Cal. Code Regs. ("C.C.R.") § 27001(b).  On January 1, 1989, one year after it was listed as a chemical known to cause cancer, formaldehyde became subject to the clear and reasonable warning requirement regarding carcinogenicity under Proposition 65.  *Id.*; Health & Safety Code § 25249.10(b).

159.   The BLU E-Cigarettes, when used as directed, produce significant amounts of formaldehyde in the aerosol inhaled by users.  Thus, the intended use of the BLU E-Cigarettes results in consumer exposures to formaldehyde.

160.   Any person acting in the public interest has standing to enforce violations of Proposition 65, provided that such person has supplied the requisite public enforcers with a valid 60-Day Notice of Violation and such public enforcers

- 64 -

are not diligently prosecuting the action within such time.  Health & Safety Code § 25249.7(d).

161.   On September 2, 2015, Plaintiff Whitney provided a 60-Day "Notice of Violation of Proposition 65" to the California Attorney General, the District Attorneys of every county in California, the City Attorneys of every California city with a population greater than 750,000 and to Defendants.  In compliance with Health & Safety Code § 25249.7(d) and 27 C.C.R. § 25903(b), the Notice included the following information: (1) the name and address of each violator; (2) the statute violated; (3) the time period during which violations occurred; (4) specific descriptions of the violations, including (a) the routes of exposure to formaldehyde from the BLU E-Cigarettes, and (b) the specific type of BLU E-Cigarettes sold and used in violation of Proposition 65; and (5) the name of the specific Proposition 65-listed chemical that is the subject of the violations described in the Notice.

162.   Plaintiff Whitney also sent a Certificate of Merit for the Notice to the California Attorney General, the District Attorneys of every county in California, the City Attorneys of every California city with a population greater than 750,000 and to the named Defendants.  In compliance with Health & Safety Code § 25249.7(d) and 11 C.C.R. § 3101, each of the Certificates certified that Plaintiffs' counsel: (1) has consulted with one or more persons with relevant and appropriate experience or expertise who reviewed facts, studies or other data regarding the exposures to formaldehyde alleged in the Notices; and (2) based on the information obtained through such consultations, believes that there is a reasonable and meritorious case for a citizen enforcement action based on the facts alleged in the Notice.  In compliance with Health & Safety Code § 25249.7(d) and 11 C.C.R. § 3102, the Certificate served on the Attorney General included factual information – provided on a confidential basis – sufficient to establish the basis for the Certificate, including the identity of the person(s) consulted by Plaintiffs' counsel and the facts, studies, or other data reviewed by such persons.

163.   None of the public prosecutors with the authority to prosecute Proposition 65 violations has commenced and/or is diligently prosecuting a cause of action against Defendants under Health & Safety Code § 25249.5, *et seq*., based on the claims asserted in Plaintiff Whitney's Notice.

164.   Under Proposition 65, an exposure is "knowing" where the party responsible for such exposure has:

> knowledge of the fact that a[n] . . . exposure to a chemical listed pursuant to [Health and Safety Code §25249.8(a)] is occurring.  No knowledge that the . . . exposure is unlawful is required.

27 C.C.R. § 25102(n).  This knowledge may be either actual or constructive.  *See, e.g.,* Final Statement of Reasons Revised (November 4, 1988) (pursuant to former 22 C.C.R. Division 2, § 12201).

165.   Throughout the relevant time period, Defendants had either actual knowledge of the fact that use of the BLU E-Cigarettes exposes users to formaldehyde, or they were reckless in not knowing.  In any event, Defendants have been informed of the formaldehyde in their BLU E-Cigarettes by the 60-Day Notice of Violation and accompanying Certificate of Merit served on them by Plaintiff Whitney.

166.   Defendants manufacture, distribute, and sell the BLU E-Cigarettes in California.  The Products, when used as directed and intended, expose users to significant quantities of formaldehyde.

167.   Proposition 65 requires that businesses such as Defendants that cause exposures to known carcinogens such as formaldehyde, must first provide a clear and reasonable warning to those exposed regarding the carcinogenic danger.

168.   Despite the fact that Defendants expose consumers of the BLU E-Cigarettes to formaldehyde, Defendants provide no clear and reasonable warnings regarding such exposures.  In fact, Defendants fail to provide any warnings

1    whatsoever about the carcinogenic hazards associated with such exposures.

2        169.   Defendants' BLU E-Cigarettes expose Plaintiffs and the members of

3    the Classes to hazardous and toxic carcinogens.   The exposure to carcinogenic

4    toxins is information that is material to a reasonable consumer.

5        170.   Defendants' failure to tell consumers that they are buying BLU E-

6    Cigarettes that will expose them to the carcinogenic toxin formaldehyde is a

7    material omission.

8        171.   Defendants knowingly fail to disclose to consumers the presence of the

9    carcinogenic toxin formaldehyde in the BLU E-Cigarettes.

10       172.   Plaintiffs and the members of the Classes do or did not know that use

11   of the BLU E-Cigarettes would expose them to formaldehyde or any chemicals

12   known to cause cancer.

13       173.   Plaintiffs and the members of the Classes would not have purchased or

14   paid as much for the BLU E-Cigarettes had they known the BLU E-Cigarettes

15   would expose them to formaldehyde and had included the cancer warnings required

16   by Proposition 65.

17       174.   Defendants' material omissions are likely to deceive a reasonable

18   consumer.

19       175.   The BLU E-Cigarettes have been sold by Defendants for use in

20   California since at least 2009.

21       176.   Defendants continue to manufacture, distribute, and sell the BLU E-

22   Cigarettes to consumers in California while knowingly failing to disclose the

23   presence of the toxin formaldehyde in the BLU E-Cigarettes.

24       177.   By committing the acts above, Defendants have violated Proposition 65

25   by knowingly and intentionally exposing individuals in California to a chemical

26   known to cause cancer without first giving clear and reasonable warnings to such

27   individuals regarding the carcinogenicity of formaldehyde.

28       178.   Violations of Proposition 65 constitute unlawful acts and practices

- 67 -

under the UCL.

## COUNT V
**Injunctive Relief And Damages For Violation of New York General Business Law**
**(N.Y. GBL Law § 349)**
**(On Behalf of The New York Plaintiff And The New York Class And Against Defendants)**

179.   The New York Plaintiff repeats and realleges the allegations contained in the paragraphs above, as if fully set forth herein.

180.   The relevant period for this cause of action is three years from the date of filing of this Complaint until judgment is entered.

181.   This cause of action is brought pursuant to New York General Business Law § 349 ("GBL § 349"), which prohibits deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in New York State.

182.   The conduct of Defendants alleged herein violates GBL § 349 in that Defendants engaged in the unfair acts and deceptive practices by actively concealing and failing to disclose to consumers, as alleged herein above, that BLU E-Cigarettes emit aerosol with known carcinogens, toxins, and other potentially harmful impurities and pose other respiratory dangers.  Defendants stated the ingredients and a nicotine warning on their packages while failing to disclose other dangers and risks about BLU E-Cigarettes as explained more fully in this complaint (including the hidden ingredients such as formaldehyde created when the product is heated during use).  Also undisclosed was the lack of additional research which such studies have determined is required to assess the full potential danger of electronic cigarettes, especially in long term users, which offend public policies and are immoral, unethical, unscrupulous and substantially injurious to consumers.  Such conduct is inherently and materially deceptive and misleading in a material respect which was known, or by the exercise of reasonable care, should have been known, to be untrue, deceptive or misleading by Defendants.

183.   The conduct of Defendants alleged herein also violates GBL § 349 in that while Defendants made certain specific representations about the risks associated with BLU E-Cigarettes, including on their packages, those representations were misleading half-truths because they implied that those are all of the material or significant risks relating to the use of the product, when, in fact, they are not.

184.   The materially misleading conduct of Defendants alleged herein was directed at the public at large.

185.   Defendants' acts and practices described above are likely to mislead a reasonable consumer acting reasonably under the circumstances.

186.   Defendants have willfully and knowingly violated GBL § 349 because, in order to increase their own profits, Defendants intentionally engaged in omitting material facts regarding their BLU E-Cigarettes as discussed above and by making fraudulent partial misrepresentations.

187.   As a result of Defendants' deceptive and misleading acts, the New York Plaintiff and the members of the New York Class have been injured because they purchased BLU E-Cigarettes without full disclosure of the material facts discussed above.

188.   As a result of Defendants' conduct in violation of GBL § 349, the New York Plaintiff and the members of the New York Class have been injured as alleged herein in amounts to be proven at trial because if Defendants had disclosed the information discussed above about BLU E-Cigarettes and otherwise been truthful about their safety, the New York Plaintiff would not have purchased Defendants' products.   Defendants were also able to charge more than what their BLU E-Cigarettes would have been worth had they disclosed the truth about them.

189.   As a result, pursuant to GBL § 349, the New York Plaintiff and the New York Class are entitled to make claims against Defendants for actual or statutory damages to be determined at trial, but not less than 50 dollars per member

of the New York Class, such damages to be trebled.

190.   Additionally, pursuant to GBL § 349, the New York Plaintiff and the New York Class make claims for attorneys' fees, costs, and injunctive relief requiring Defendants to adequately disclose the omitted information described above.

## COUNT VI
### Damages For Fraudulent Concealment Under Illinois Law
### (On Behalf of the Illinois Plaintiff And The Illinois Class And Against Defendants)

191.   The Illinois Plaintiff realleges and incorporates by reference the allegations contained in the paragraphs above, as if fully set forth herein.

192.   The relevant period for this cause of action is five years from the filing of the original complaint until judgment is entered.

193.   The Illinois Plaintiff brings this claim individually and on behalf of the Illinois Class.

194.   As alleged herein, the Illinois Plaintiff has suffered injury in fact and lost money or property as a result of Defendants' conduct because she purchased BLU E-Cigarettes in reliance on Defendants' active concealment and omission of material facts and false and misleading partial misrepresentations, as detailed above.

195.   Specifically, the Illinois Plaintiff relied on the warning on the packages and the ingredient list as being the full truth, and purchased BLU E-Cigarettes believing that the only material health risks associated with using them were those that were disclosed on the package relating to nicotine.   In fact, those representations omitted the fact that studies have found, including studies performed on BLU E-Cigarettes, that they contain detectable levels of known carcinogens, toxic chemicals and other contaminants and impurities that are, or potentially are, disease-causing.  Defendants' listing of the ingredients on the package but failure to disclose to users the hidden ingredients of carcinogens and toxins caused by heating of certain such ingredients was a material omission and false and misleading partial

- 70 -

SECOND CONSOLIDATED AMENDED COMPLAINT

misrepresentation.   Defendants also concealed the serious respiratory effects of smoking BLUs and the fact that there are no long term studies done on their safety, as described *supra*.

196.  Defendants knew of the false and misleading nature of their partial misrepresentations and omissions prior to the Illinois Plaintiff's purchases because Defendants knew that their BLU E-Cigarettes were emitting aerosol with known carcinogens and other toxins as early as 2009, when the FDA publicized a study it had conducted with this conclusion and advised that it was concerned about the safety of E-Cigarettes and the manner in which the products were being marketed. Defendants also knew that their BLU E-Cigarettes could cause dangerous respiratory problems, as described in the studies cited herein, many of which were published prior to the Illinois Plaintiff's purchases from approximately March through August 2013.  Defendants also knew that there was a lack of additional research which such studies have determined is required to assess the full potential danger of electronic cigarettes, especially in long term users. Specifically evidencing Defendants' knowledge of the falsity of their omissions and partial misrepresentations is Defendant Lorillard's participation at least by 2013 in CORESTA, an organization formed in part to respond to scientific research relating to tobacco products, including E-Cigarettes, as described above.  In addition, as described *supra*, Lorillard admitted in comments to the FDA that it took steps after it acquired BLU in 2012 to study the safety of BLU and its aerosol and that BLU's contain toxins and other unhealthy substances and there are no long-term studies on their safety.  Despite this knowledge, Defendants failed to disclose to and actively concealed these material facts from the Illinois Plaintiff and the members of the Illinois Class.  By representing on the package that the only known negative health effects related to the use of BLU E-Cigarettes was nicotine, and listing the ingredients but failing to disclose the hidden ingredients of carcinogens and toxins caused by heating such ingredients when smoked as intended, Defendants misled the

- 71 -

SECOND CONSOLIDATED AMENDED COMPLAINT

Illinois Plaintiff and concealed material facts that would have influenced her decision to buy Defendants' BLU E-Cigarettes.

197.   As further evidence of Defendants' continuing attempts to actively conceal the risks of their BLU E-Cigarettes, Defendants' website deceptively tells consumers to ignore negative studies, which conclude E-Cigarettes are harmful and not proven safe, as nothing more than media hype, as discussed *supra*.

198.   Defendants intended that the Illinois Plaintiff and the Illinois Class rely on their deceptive acts or practices described *supra*.  Defendants' intent is evidenced by their actions, claims, nondisclosures, and misleading statements as alleged in this SCAC, that were false, misleading, and likely to deceive the consuming public, *inter alia*, their knowledge that their material misrepresentations or omissions were unlawful in Illinois, and their continuation of such activity in the face of their own testing and other independent studies that confirm that their BLU E-Cigarettes emit harmful carcinogens and have other dangers other than those related to nicotine. Specifically, Defendants intended consumers, including the Illinois Plaintiff and members of the Illinois Class, to rely on Defendants' representations because Defendants knew that had they been truthful and fully informed the consuming public that their products emitted known carcinogens, such as formaldehyde, and other toxins, consumers would not have purchased their products or would have paid less than the retail price.  Defendants intentionally omitted these facts for the same reason, putting profits over safety.  Defendants had a duty to disclose the omitted facts because their representations were actually false and therefore had a duty to correct consumers' misapprehension regarding the safety of BLU E-Cigarettes that Defendants themselves created and/or because once Defendants spoke they had a duty to disclose the full truth, and not make false and misleading partial representations.  In short, Defendants' duty to disclose arises from their deceptive conduct and active suppression of material facts.

///

199.   The Illinois Plaintiff has in fact been deceived as a result of her reliance on Defendants' material omissions and false and misleading partial misrepresentations, which are described above.   Defendants omitted and misrepresented facts that were material to the Illinois Plaintiff in that those facts were relevant to her health, and therefore, influenced her decision to purchase BLU E-Cigarettes.

200.   Defendants' material omissions and false and misleading partial misrepresentations described above have caused harm to the Illinois Plaintiff and other members of the Illinois Class who each purchased Defendants' BLU E-Cigarettes.   The Illinois Plaintiff and the other Illinois Class members have suffered injury in fact and lost money as a result of these unlawful, unfair, and fraudulent practices.

### COUNT VII
**Injunctive Relief And Damages For Violations of The Illinois Consumer Fraud And Deceptive Business Practices Act**
**(815 ILCS 505/1, *et seq*.)**
**(On Behalf of the Illinois Plaintiff And The Illinois Class And Against Defendants)**

201.   The Illinois Plaintiff realleges and incorporates by reference the allegations contained in the paragraphs above, as if fully set forth herein.

202.   The relevant period for this cause of action is three years from the filing of the original complaint until judgment is entered.

203.   The Illinois Plaintiff brings this claim individually and on behalf of the Illinois Class.

204.   As alleged herein, the Illinois Plaintiff has suffered injury in fact and lost money or property as a result of Defendants' conduct because she purchased BLU E-Cigarettes in reliance on Defendants' active concealment and omissions of material facts and false and misleading partial misrepresentation, detailed above, but did not receive a product containing the characteristics detailed above.

- 73 -

205.   Specifically, the Illinois Plaintiff relied on the warning on the packages and the ingredient list as being the full truth, and purchased BLU E-Cigarettes believing that the only material health risks associated with using them were those that were disclosed on the package relating to nicotine.   In fact, those representations omitted the fact that studies have found, including studies performed on BLU E-Cigarettes, that they contain detectable levels of known carcinogens, toxic chemicals and other contaminants and impurities that are, or potentially are, disease-causing.  Defendants' listing of the ingredients on the package but failure to disclose to users the hidden ingredients of carcinogens and toxins caused by heating of certain such ingredients was a material omission and false and misleading partial misrepresentation.   Defendants also concealed the serious respiratory effects of smoking BLUs and the fact that there are no long term studies done on their safety, as described *supra*.

206.   Defendants knew of the false and misleading nature of their omissions and partial misrepresentations prior to the Illinois Plaintiff's purchases because Defendants knew that their BLU E-Cigarettes were emitting aerosol with known carcinogens and other toxins as early as 2009, when the FDA publicized a study it had conducted with this conclusion and advised that it was concerned about the safety of E-Cigarettes and the manner in which the products were being marketed. Defendants also knew that their BLU E-Cigarettes could cause dangerous respiratory problems, as described in the studies cited herein, many of which were published prior to the Illinois Plaintiff's purchases from approximately March through August 2013.  Defendants also knew that there was a lack of additional research which such studies have determined is required to assess the full potential danger of electronic cigarettes, especially in long term users. Specifically evidencing Defendants' knowledge of the falsity of omissions and partial misrepresentations is Defendant Lorillard's participation at least by 2013 in CORESTA, an organization formed in part to respond to scientific research relating to tobacco products,

including E-Cigarettes as described above.  In addition, as described *supra*, Lorillard admitted in comments to the FDA that it took steps after it acquired BLU in 2012 to study the safety of BLU and its aerosol and that BLU's contain toxins and other unhealthy substances and there are no long-term studies on their safety.  Despite this knowledge, Defendants failed to disclose to and actively concealed these material facts from the Illinois Plaintiff and the members of the Illinois Class.  By representing on the package that the only known negative health effects related to the use of BLU E-Cigarettes was nicotine, and listing the ingredients but failing to disclose the hidden ingredients of carcinogens and toxins caused by heating such ingredients when smoked as intended, Defendants misled the Illinois Plaintiff and concealed material facts that would have influenced her decision to buy Defendants' BLU E-Cigarettes.

207.   At all times relevant hereto, there was in full force and effect the ICFA, 815 ILCS 505/1, *et seq.*

208.   The ICFA is a regulatory and remedial statute intended to protect consumers, including the Illinois Plaintiff and the Illinois Class, against unfair or deceptive acts or practices. Specifically, Section 2 of the ICFA prohibits deceptive acts or practices, which are committed in the course of trade or commerce and with the intent that others rely upon them. 815 ILCS 505/2.

209.   Section 2 provides, in full: "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act,' approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section, consideration shall be

given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act." 815 ILCS 505/2.

210. Section 2 of the Uniform Deceptive Trade Practices Act states in relevant part that: "A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person ... represents that goods or services have . . . characteristics, . . . uses, [or] benefits . . . that they do not have . . . ." 815 ILCS 510/2(a)(5).

211. The Illinois Plaintiff and the Illinois Class reserve the right to allege other violations of law, which constitute other unlawful business acts or practices.

212. Such conduct is ongoing and continues to this date. As evidence of Defendants' continuing attempts to actively conceal the risks of their BLU E-Cigarettes, Defendants' website deceptively tells consumers to ignore negative studies, which conclude E-Cigarettes are harmful and not proven safe, as nothing more than media hype, as described *supra*.

213. The above-described unfair or deceptive acts or practices occurred in the course of conduct involving trade or commerce, namely, the sale of goods to the Illinois Plaintiff and the Illinois Class.

214. Defendants' practice of knowingly and unlawfully engaging in the activity described above also constitutes "unfair" business acts or practices because, *inter alia*, Defendants engaged in false advertising, which misrepresents and omits material facts regarding BLU E-Cigarettes. Defendants' business acts or practices therefore offend an established public policy, and Defendants engage in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers, as alleged in detail *supra*, and therefore, Defendants' actions are unfair or deceptive acts or practices prohibited by Chapter 2 of the ICFA. 815 ILCS 505/2.

215. Defendants intended that the Illinois Plaintiff and the Illinois Class rely on their deceptive acts or practices described *supra*. Defendants' intent is evidenced by their actions, claims, nondisclosures, and misleading statements as alleged in this

- 76 -

SCAC, that were false, misleading, and likely to deceive the consuming public, *inter alia*, their knowledge that their material misrepresentations or omissions were unlawful in Illinois and their continuation of such activity in the face their own testing and other independent studies that confirm that their BLU E-Cigarettes emit harmful carcinogens and have other dangers other than those related to nicotine. Specifically, Defendants intended consumers, including the Illinois Plaintiff and members of the Illinois Class, to rely on Defendants' representations because Defendants knew that had they been truthful and fully informed the consuming public that their products emitted known carcinogens, such as formaldehyde, and other toxins, consumers would not have purchased their products or would have paid less than the retail price. Defendants intentionally omitted these facts for the same reason, putting profits over safety. Defendants had a duty to disclose the omitted facts because their representations were actually false and therefore had a duty to correct consumers' misapprehension regarding the safety of BLU E-Cigarettes that Defendants themselves created and/or because once Defendants spoke they had a duty to disclose the full truth, and not make false and misleading partial representations. In short, Defendants' duty to disclose arises from their deceptive conduct and active suppression of material facts.

216. The Illinois Plaintiff has in fact been deceived as a result of her reliance on Defendants' material omissions and false and misleading partial representations, which are described above. Defendants omitted and misrepresented facts that were material to the Illinois Plaintiff in that those facts were relevant to her health, and therefore, influenced her decision to purchase BLU E-Cigarettes.

217. Defendants' material omissions and false and misleading partial misrepresentations described above have caused harm to the Illinois Plaintiff and other members of the Illinois Class who each purchased Defendants' BLU E-Cigarettes. The Illinois Plaintiff and the other Illinois Class members have suffered injury in fact and lost money as a result of these unlawful, unfair, and fraudulent

1  practices.

2  ### VII.   <u>PRAYER FOR RELIEF</u>

3  Wherefore, Plaintiffs, on behalf of themselves and the Classes, pray for a

4  judgment:

5  a.   Certifying the California, New York, and Illinois Classes as requested

6  herein, appointing Plaintiffs as class representatives for the respective

7  Classes they seek to represent, and appointing Plaintiffs' attorneys as

8  counsel for the Classes;

9  b.   Requiring Defendants to disgorge or return all monies, revenues and

10  profits obtained by means of any wrongful act or practice to Plaintiffs

11  and the members of the Classes under Cal. Bus. & Prof. Code § 17200,

12  *et seq.*, and each other cause of action where such relief is permitted;

13  c.   Enjoining Defendants from continuing the unlawful practices as set

14  forth herein, including marketing or selling BLUs without disclosing

15  the potential health and safety risks relating thereto, and directing

16  Defendants to engage in corrective action, or providing other injunctive

17  or equitable relief;

18  d.   Awarding exemplary and punitive damages pursuant to Cal. Civ. Code

19  § 1780 to prevent and deter Defendants from future unlawful conduct;

20  e.   Awarding damages or restitution as appropriate to Plaintiffs and each

21  member of the California, New York, and Illinois Classes pursuant to

22  the CLRA, UCL, FAL, GBL, ICFA and Illinois fraudulent concealment

23  claim;

24  f.   Awarding all equitable remedies available pursuant to Cal. Civ. Code §

25  1780 and other applicable law;

26  g.   Awarding attorneys' fees and costs;

27  h.   Awarding pre-judgment and post-judgment interest at the legal rate;

28  and

1    i.    Providing such further relief as may be just and proper.

2   Dated: May 23, 2016                    **BISNAR | CHASE LLP**

3                                  By:  */s/ Jerusalem F. Beligan*
                                        BRIAN D. CHASE (164109)
4                                        bchase@bisnarchase.com
                                        JERUSALEM F. BELIGAN (211258)
5                                        jbeligan@bisnarchase.com
                                        1301 Dove Street, Suite 120
6                                        Newport Beach, CA 92660
                                        Telephone: 949/752-2999
7                                        Facsimile: 949/752-2777

8
                                        **WOLF HALDENSTEIN ADLER**
9                                          **FREEMAN & HERZ LLP**
                                        JANINE L. POLLACK
10                                       pollack@whafh.com
                                        DEMET BASAR
11                                       basar@whafh.com
                                        KATE M. MCGUIRE
12                                       mcguire@whafh.com
                                        270 Madison Avenue
13                                       New York, New York 10016
                                        Telephone: 212/545-4600
14                                       Facsimile: 212/545-4653

15
                                        **LEVI & KORSINKSY LLP**
16                                       EDUARD KORSINSKY
                                        ek@zlk.com
17                                       SHANNON L. HOPKINS
                                        shopkins@zlk.com
18                                       NANCY A. KULESA
                                        nkulesa@zlk.com
19                                       STEPHANIE A. BARTONE
                                        sbartone@zlk.com
20                                       30 Broad Street, 24th Floor
                                        New York, NY 10004
21                                       Telephone: 212/363-7500
                                        Facsimile: 866/367-6510
22

23
                                        **LEXINGTON LAW GROUP**
24                                       MARK N. TODZO (168389)
                                        mtodzo@lexlawgroup.com
25                                       LUCAS WILLIAMS (264518)
                                        lwilliams@lexlawgroup.com
26                                       503 Divisadero Street
                                        San Francisco, CA 94117
27                                       Telephone: (415) 913-7800
                                        Facsimile: (415) 759-4112
28

- 79 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SCOTT+SCOTT LLP**
CHRISTOPHER M. BURKE (214799)
cburke@scott-scott.com
JOHN T. JASNOCH (281605)
jjasnoch@scott-scott.com
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508

**COHELAN KHOURY & SINGER**
TIMOTHY D. COHELAN (60827)
tcohelan@ckslaw.com
ISAM C. KHOURY (58759)
ikhoury@ckslaw.com
MICHAEL D. SINGER (179630)
msinger@ckslaw.com
JEFF GERACI (151519)
jconnor@ckslaw.com
605 "C" Street, Suite 200
San Diego, CA 92101
Telephone: 619/595-3001
Facsimile: 619/595-3000

**LAW OFFICES OF MICHAEL P. SOUSA, APC**
MICHAEL P. SOUSA (229416)
msousa@msousalaw.com
3232 Governor Drive, Suite A
San Diego, CA 92122
Telephone: 858/453-6122
Facsimile: 858/453-2155

**JOSE GARAY, APLC**
JOSE GARAY (200494)
jgaray@garaylaw.com
9861 Irvine Center Drive
Irvine, CA 92618
Telephone: 949/208-3400
Facsimile: 949/713-0432

**THE WILNER FIRM, P.A.**
RICHARD J. LANTINBERG
rlantinberg@wilnerfirm.com
444 E. Duval Street
Jacksonville, FL 32202
Telephone: 904/446-9817
Facsimile: 904/446-9825

- 80 -

SECOND CONSOLIDATED AMENDED COMPLAINT

1
2
3
4
5

**FORCHELLI CURTO DEEGAN**
   **SCHWARTZ MINEO & TERRANA,**
   **LLP**
ELBERT NASIS
enasis@forchellilaw.com
The Omni
333 Earle Ovington Boulevard, Suite 1010
Uniondale, NY 11553
Telephone: 516/248-1700
Facsimile: 516/248-1729

6
7
8

### VIII.   DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

9

Dated: May 23, 2016            **BISNAR | CHASE LLP**

10
11
12
13
14

By:   */s/ Jerusalem F. Beligan*
      BRIAN D. CHASE (164109)
      bchase@bisnarchase.com
      JERUSALEM F. BELIGAN (211258)
      jbeligan@bisnarchase.com
      1301 Dove Street, Suite 120
      Newport Beach, CA 92660
      Telephone: 949/752-2999
      Facsimile: 949/752-2777

15
16
17
18
19
20
21

**WOLF HALDENSTEIN ADLER**
   **FREEMAN & HERZ LLP**
JANINE L. POLLACK
pollack@whafh.com
DEMET BASAR
basar@whafh.com
KATE M. MCGUIRE
mcguire@whafh.com
270 Madison Avenue
New York, New York 10016
Telephone: 212/545-4600
Facsimile: 212/545-4653

22
23
24
25
26
27
28

**LEVI & KORSINKSY LLP**
EDUARD KORSINSKY
ek@zlk.com
SHANNON L. HOPKINS
shopkins@zlk.com
NANCY A. KULESA
nkulesa@zlk.com
STEPHANIE A. BARTONE
sbartone@zlk.com
30 Broad Street, 24th Floor
New York, NY 10004
Telephone: 212/363-7500
Facsimile: 866/367-6510

- 81 -

**COHELAN KHOURY & SINGER**
TIMOTHY D. COHELAN (60827)
tcohelan@ckslaw.com
ISAM C. KHOURY (58759)
ikhoury@ckslaw.com
MICHAEL D. SINGER (179630)
msinger@ckslaw.com
JEFF GERACI (151519)
jconnor@ckslaw.com
605 "C" Street, Suite 200
San Diego, CA 92101
Telephone:  619/595-3001
Facsimile:  619/595-3000


**LAW OFFICES OF MICHAEL P. SOUSA, APC**
MICHAEL P. SOUSA (229416)
msousalaw@msousalaw.com
3232 Governor Drive, Suite A
San Diego, CA 92122
Telephone: 858/453-6122
Facsimile: 858/453-2155


**JOSE GARAY, APLC**
JOSE GARAY (200494)
jgaray@garaylaw.com
9861 Irvine Center Drive
Irvine, CA 92618
Telephone: 949/208-3400
Facsimile: 949/713-0432


**THE WILNER FIRM, P.A.**
RICHARD J. LANTINBERG
rlantinberg@wilnerfirm.com
444 E. Duval Street
Jacksonville, FL 32202
Telephone: 904/446-9817
Facsimile: 904/446-9825


**FORCHELLI CURTO DEEGAN
  SCHWARTZ MINEO & TERRANA,
  LLP**
ELBERT NASIS
enasis@forchellilaw.com
The Omni
333 Earle Ovington Boulevard, Suite 1010
Uniondale, NY 11553
Telephone: 516/248-1700
Facsimile: 516/248-1729

- 82 -

SECOND CONSOLIDATED AMENDED COMPLAINT